## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-003018-MSK-MJW

CLARENCE MOSES-EL,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
MITCHELL R. MORRISSEY, Former Denver District Attorney, in his individual capacity;
BONNIE BENEDETTI, Chief Deputy District Attorney for the Denver District Attorney's Office, in her individual capacity;
ROBIN WHITLEY, Former Deputy District Attorney for the Denver District Attorney's Office, in his individual capacity;
LYNN KIMBROUGH, Former Communications Director for the Denver District Attorney's Office, in her individual capacity;
JEFF CARROLL, Investigator for the Denver District Attorney's Office Investigator, in his individual capacity;
DR. KATHREN BROWN-DRESSEL, Former Colorado Bureau of Investigation and Denver Police Department Forensic Serologist, in her individual capacity; and
ESTATE OF JAMES HUFF, Denver Police Department Detective, in his individual capacity;

      Defendants.

_____

## AMENDED COMPLAINT AND JURY DEMAND
_____

      Plaintiff Clarence Moses-EL, through his attorneys, Gail K. Johnson, Eric K.

Klein, and Aurora L. Randolph of Johnson & Klein, PLLC, hereby submits this

Complaint alleging violations of his constitutional rights.

# I.      INTRODUCTION

1.      On August 18, 1987, Clarence Moses-EL, age 32, walked out of his front door for what would be the last time for almost three decades.  He started riding his bike through Denver with his 3-year-old son Anthony Burke on his handlebars, not knowing that he would be unable to share another ride with his young child ever again because he was about to be arrested for a brutal sexual assault he did not commit.

2.      Mr. Moses-EL was wrongfully convicted and imprisoned for more than 28 years in the Colorado Department of Corrections (DOC).  He always maintained his innocence.  But shoddy investigation, the willful destruction of exculpatory biological evidence, and prosecutors blinded by the desire to obtain and maintain convictions regardless of the truth left Mr. Moses-EL in the cross-hairs of a powerful criminal-justice system that would fail him time and time again.

3.      The crimes for which Mr. Moses-EL was wrongfully convicted involved a brutal sexual assault and physical beating of a woman in her own home in the middle of the night.  There is not now and never has been any physical evidence that Mr. Moses-EL committed these crimes.

4.      The sole reason Mr. Moses-EL was ultimately arrested and prosecuted for these crimes was the victim's dream-induced identification of him while she was on medication at the hospital.  But there were many other reasons why that identification was unreliable.

5.      When police first interviewed the victim at her sister's house near the scene of the crime, she said she had not gotten a good look at her attacker because it had been too dark.

6.      She then gave a limited physical description of the attacker's hairstyle, explaining that it was the same hairstyle as that of two men she had been drinking with that night, one of whom was a man named L.C. Jackson.  (The hairstyle she described did not match Mr. Moses-EL's hair.)

7.      Mr. Moses-EL lived in the victim's neighborhood and was known to the victim by his then-nickname, "Bubbles."  At no point at the scene or at the hospital before her dream did the victim say that her attacker was "Bubbles."

8.      To the contrary, at the hospital, when pressed by her sister and then the police to identify who had attacked her, the victim repeatedly identified three men she had been drinking with that night—L.C., Earl, and Darnell.

9.      It was only while she was under medication in the hospital, following a dream in which she believed that she had re-lived the attack, that the victim awoke and first accused Mr. Moses-EL (by his nickname).

10.     Adding to the unreliability of this already highly questionable identification was the fact that the victim had been publicly feuding with Mr. Moses-EL's girlfriend. The Denver Police Department and the Denver District Attorney's Office (Denver DA's Office) were well aware of this bad blood.  Defendant Detective James Huff, a Denver

Police Department Detective who investigated the case, later revealed that due to the conflict between the victim and Mr. Moses-EL's girlfriend, he had always had doubts about whether Mr. Moses-EL truly was the perpetrator.

11.     The man who did commit the crimes against the victim was L.C. Jackson. Mr. Jackson was one of the three men the victim had identified, and he was one of two men she said matched the physical description of the perpetrator.  He also had a history of committing sexual assaults.  Despite all this, the Denver Police Department and the Denver DA's Office failed to investigate Mr. Jackson as a suspect, instead doggedly pursuing Mr. Moses-EL based on nothing more than an identification that was patently unbelievable.

12.     Despite a lack of probable cause, Mr. Moses-EL was charged with first-degree sexual assault with serious bodily injury in violation of Colorado Revised Statutes § 18-3-402(3)(b); second-degree burglary of a dwelling in violation of Colorado Revised Statutes § 18-4-203(1), (2)(a); and second-degree assault in violation of Colorado Revised Statutes § 18-3-203.

13.     Beginning immediately after his arrest, Mr. Moses-EL sought to exonerate himself through the collection and testing of physical evidence.  While pending trial at the jail, Mr. Moses-EL asked his attorney, a deputy public defender, to have DNA testing conducted on the biological evidence that had been collected from the victim and her home immediately following the rape.  But the public defender refused to pursue any

DNA testing, because his supervisors in the public defender's office believed that the admission of DNA evidence—a powerful tool for prosecutors—should be opposed in every case.  And at trial, the forensic serologist presented by the Denver DA's Office's misled the jury by opining in a misleading manner that there was no way Mr. Moses-EL could be excluded as the perpetrator based on the physical evidence.

14.     Because the Denver Police Department and the Denver DA's Office focused their investigation on Mr. Moses-EL and failed to investigate L.C. Jackson as a suspect in the August 1987 sexual assault against the victim, Mr. Jackson was left at liberty to victimize other members of the Denver community.  And he did just that.  In November 1987, Mr. Jackson burglarized the home of his aunt in Denver.  Around 1992, Mr. Jackson choked his then-girlfriend so hard the blood vessels in her eyeballs burst.  In 1992, just about a mile away from the Denver location where he had sexually assaulted and beat the victim in Mr. Moses-EL's case in her own home in the early morning hours, Mr. Jackson raped a middle-aged woman and her nine-year old daughter in their respective bedrooms in the upstairs of their home at around 2:30 a.m.  And around 1997, Mr. Jackson sexually assaulted another young girl in Denver, the daughter of a girlfriend of his at the time.

15.     Meanwhile, Mr. Moses-EL—largely on his own—spent more than five years fighting in the courts to obtain the ability to conduct DNA testing to exonerate himself.  In November 1995, he finally won, obtaining a court order requiring the Denver

Police Department to preserve the biological evidence in the case for defense DNA testing. Mr. Moses-EL had raised the money for the DNA test from other inmates in the DOC.

16.     But in December 1995, before the DNA test that would have exonerated Mr. Moses-EL was conducted, the Denver Police Department destroyed all of the biological evidence from the case. This was part of a pattern of their mishandling gravely important evidence. All hope for Mr. Moses-EL's exoneration—and for the conclusive identification of the true perpetrator—was lost. And Mr. Moses-EL continued to be locked up in a prison cell for crimes he did not commit.

17.     In 2006, the Denver DA's Office successfully prosecuted L.C. Jackson for the sexual assaults of the mother and daughter that he had committed in Denver in 1992. Ironically, the Denver DA Office's prosecution of Mr. Jackson for these 1992 rapes was based on a cold-hit DNA match.

18.     Although the Denver DA's Office knew that Mr. Jackson—one of the men identified by the victim in Mr. Moses-EL's case—was a violent rapist, they did not re-open the investigation into Mr. Moses-EL's case and did not investigate whether Mr. Jackson was the true perpetrator of the crimes for which Mr. Moses-EL had now spent more than 18 years behind bars.

19.     In 2008, Mr. Moses-EL was given a glimmer of hope when state legislators took notice of the injustice of his case and began a legislative effort to provide him, and others who had material evidence in their case destroyed, a new trial.

20.     Mr. Moses-EL's moment of hope that the truth in his case would yet be revealed was short-lived.  Defendants Morrissey and Whitley used their political power to orchestrate a misinformation campaign at the legislature targeted at denying Mr. Moses-EL a new trial.  These lies had their intended effect, causing state legislators to pass only a watered-down version of the bill that did not apply to Mr. Moses-EL's case.

21.     In April 2012, after Mr. Moses-EL had served 25 years of his sentence, he received a letter from Mr. Jackson suggesting that he was ready to reveal information that would be useful to Mr. Moses-EL's defense team.  Over the course of several years, Mr. Jackson repeatedly made multiple admissions that implicated himself in the crimes for which Mr. Moses-EL had been wrongfully convicted.

22.     In December 2015, based on this and other newly-discovered evidence, the Denver District Court vacated Mr. Moses-EL's convictions and granted him a new trial.

23.     The Denver Police Department and the Denver DA's Office were then forced to confront the fact that as a result of their woefully inadequate investigation, their malicious prosecution of Mr. Moses-EL, and their continued efforts to keep Mr. Moses-EL in prison, an innocent man was wrongfully imprisoned for more than 28 years while a serial rapist had remained free to victimize Denver women and children.

24.     Defendants used every tactic—both legal and illegal—to try and cover up the decades of injustice perpetrated against Mr. Moses-EL.  Defendants Benedetti and Carroll intimidated Mr. Jackson into falsely recanting his admissions of culpability and manufactured evidence to create probable cause against Mr. Moses-EL for a second trial for the same crimes.  Defendant Morrissey, having ultimately failed to stop Mr. Moses-EL from receiving a new trial, and facing public pressure to drop the charges, directed Defendant Kimbrough (the Denver DA's Office's Communications Director) to spread false information to the media and the public about the facts of the case.

25.     In 2016, still clinging to the flawed dream-induced identification made by the victim in the hospital, and notwithstanding the fact that a man she had previously identified as her assailant had admitted to a violent sexual encounter with her at her home at the time of the attack, the Denver DA's Office brought Mr. Moses-EL to a second trial for the 1987 attack.  On November 14, 2016, a Denver jury found Mr. Moses-EL not guilty of all charges.

26.     Defendants had many opportunities to stop the train of injustice that kept Mr. Moses-EL locked up for nearly three decades and turn it around—but at every step along the way, they did not.  Mr. Moses-EL's was not a case of one rogue public official momentarily overstepping the law, but of many officials acting with deliberation, knowledge, and malice over the course of years to protect the reputation of themselves, their colleagues and friends, and their office, and to defend their conviction without

8

regard for the truth or justice.  Defendant City and County of Denver—through the actions of these Defendants, the Denver Police Department, and the Denver DA's Office—had a practice and custom of using the full force of its authority to cover-up wrongful convictions with reckless disregard for the truth.

## II.    JURISDICTION AND VENUE

27.    This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.  Jurisdiction supporting Mr. Moses-EL's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

28.    Venue in the District of Colorado is proper under 28 U.S.C § 1391(b) because all of the events relevant to the claims contained herein occurred in the State of Colorado.

## III.    PARTIES

29.    Plaintiff Clarence Moses-EL is a resident of Denver, Colorado.  At all times relevant to this Complaint, he resided or was incarcerated in Colorado.

30.    Defendant City and County of Denver was at all times relevant herein a municipal entity created and authorized under the laws of Colorado.  Defendant City and County of Denver was, at all times relevant herein, authorized by law to maintain and did maintain a police department known as the Denver Police Department.   Defendant City and County of Denver is responsible for the supervision, training, official policies, customs, and actual practices of its agents and the Denver Police Department.  Defendant

City and County of Denver, at all times relevant herein, also maintained the Denver District Attorney's Office.  Defendant City and County of Denver is responsible for the supervision, training, official policies, customs, and actual practices of its agents and the Denver District Attorney's Office, and oversees its budget.  And the Denver District Attorney's Office is responsible for providing training for police officers "regarding legal issues in criminal justice," and "provides legal training to the Denver Police Academy on Colorado criminal statutes and constitutional law, as well as ongoing in-service and specialized training as requested by the Denver Police."[1]

31.     Defendant Mitchell Morrissey is a former Denver District Attorney in Denver, Colorado.  He acted under color of law and in the scope of his employment when engaging in the actions and omissions alleged in this Complaint.  He is sued in his individual capacity.

32.     Defendant Bonnie Benedetti is a Chief Deputy District Attorney for the Denver DA's Office in Denver, Colorado.  She acted under color of law and in the scope of her employment when engaging in the actions and omissions alleged in this Complaint.  She is sued in her individual capacity

33.     Defendant Robin Whitley is a former Deputy District Attorney for the Denver DA's Office in Denver, Colorado. He acted under color of law and in the scope

---

[1] *See* City and County of Denver, Mayor's 2018 Budget: Vol. II, p. 544, available at https://www.denvergov.org/content/dam/denvergov/Portals/344/documents/Budget/2018/Budget Book/Document_BudgetBookVolume2_2018.pdf (last accessed Mar. 24, 2018).

of his employment when engaging in the actions and omissions alleged in this Complaint. He is sued in his individual capacity.

34.     Defendant Lynn Kimbrough is a former Communications Director for the Denver DA's Office in Denver, Colorado.  She acted under color of law and in the scope of her employment when engaging in the actions and omissions alleged in this Complaint.  She is sued in her individual capacity.

35.     Defendant Jeff Carroll is an investigator for the Denver DA's Office and a former Denver Police Department Detective in Denver, Colorado.  He acted under color of law and in the scope of his employment when engaging in the actions and omissions alleged in this Complaint.  He is sued in his individual capacity.

36.     Defendant Kathren Brown-Dressel is a former Colorado Bureau of Investigation and Denver Police Department Forensic Serologist.  She acted under color of law and in the scope of her employment when engaging in the actions and omissions alleged in this Complaint.  She is sued in her individual capacity.

37.     James Huff is a former Denver Police Department Detective.  He acted under color of law and in the scope of his employment when engaging in the actions and omissions alleged in this Complaint.  He is sued in his individual capacity.  Because Mr. Huff is deceased, he is sued through his estate and/or personal representative.

## IV.   FACTUAL BACKGROUND

A.   **The 1987 Rape and Assault of T.S.[2]**

38.      On the night of August 15, 1987, in Denver, Colorado, a group of people were drinking alcohol at the home of Pamela ("Poo-Poo") Sanders.  The group at Ms. Sanders's home included Ms. Sanders's close friend and neighbor, T.S.; Ms. Sanders's then-boyfriend, L.C. Jackson; his brother Earl; and a man named Darnell.  Ms. Sanders lived in an attached unit of a low-income housing project, only two doors down from the similar unit that was T.S.'s home.  L.C. Jackson was living at Ms. Sanders's home at that time and knew that T.S.'s home had a similar floor plan.

39.      T.S., a 4'11", 98-pound woman, had been drinking alcohol all evening and continued to drink malt liquor at Ms. Sanders's party until around 2:15 am the next morning, August 16, 1987.  She drank at least five or six Schlitz Malt Liquor Bulls until she felt sick to her stomach and decided to walk home.

40.      Mr. Moses-EL did not attend this party.

41.      When she arrived home, T.S. was alone in the house with her two young children, who were six months and two years old.  Her boyfriend at the time was allegedly in Georgia.  T.S. was someone who believed she had premonitions or visions that came true.  She had recently had a premonition that something bad was going to happen to her while her boyfriend was away.  Therefore, she and the children were sleeping in the living room.

---

[2] This Amended Complaint refers to the victim by her initials, "T.S."

42.     Upon arriving home, T.S. took off her glasses and lay down on the couch in the living room to sleep.  She got up to go vomit and then lay back down.

43.     All the lights were off, and the house was dark.

44.     T.S. was extremely nearsighted, and her glasses were very thick.  Without her glasses on, she was basically blind.

45.     While she was lying on the couch in the dark, an unseen person started beating her so severely that several bones in her face were fractured, her eyes swelled shut, and she was knocked unconscious.  When she regained consciousness, the attacker was choking her.  He repeatedly sexually assaulted her, raping her both vaginally and anally and penetrating her with his fingers and his penis.

46.     While the assailant was in the midst of sexually assaulting T.S. on the living-room couch, she accidentally kicked her baby from the couch onto the floor.  The assailant picked the baby up and swung her back up onto the couch.

47.     The assailant then covered T.S.'s face with his do-rag, put it around her neck, and dragged her upstairs, where he raped her again in her upstairs bedroom.

48.     While they were upstairs, T.S. heard her baby starting to cry.  She asked her assailant if she could go get her baby.  He hit her again in the face and told her to "shut up."

49.     The assailant left T.S.'s home.  Her wallet was left behind on the floor as if it had been rifled through.

50.     T.S. believed the assailant had entered her home through her kitchen window.

51.     After the assailant departed, T.S. left her home and first went to Ms. Sanders's home.  She knocked, but no one answered.  She then walked to the nearby home of her sister, Denise Cousin, to get help.  Around 3:30 am, Ms. Cousin opened her door and saw a woman injured and bleeding.  T.S. was so badly beaten that Ms. Cousin initially did not even recognize her (her own sister).  T.S. told Ms. Cousin that she had been raped.  T.S. described what had happened but did not identify her rapist.  Ms. Cousin's then-boyfriend, Floyd Wesley Howard, called the police.

52.     At this point—shortly after her attack—T.S. did not identify Mr. Moses-EL as her assailant, even though he lived in her neighborhood and was known to her by his then-nickname, "Bubbles."

53.     At around 3:50 am, the police arrived.  The responding officer interviewed T.S. about what had happened to her and asked her for information about her attacker. T.S. told him that she did not get a good look at him because it had been dark and the lights were out.  The only description she could provide was: a black male with slicked-back, wavy hair.  T.S. told the officer that she had been with two men earlier that night who had the same hairstyle as the assailant: L.C. and Earl.

54.     T.S. was taken by ambulance to the hospital that morning.  A couple of hours later, her sister, Ms. Cousin, visited her there.  Ms. Cousin repeatedly asked T.S.

who had done this to her, and T.S. replied: "Darnell, Earl, L.C." T.S. also told police at the hospital that her assailant was L.C., Earl, or Darnell.

**B.     T.S.'s Unreliable "Identification" of Mr. Moses-EL.**

55.     At the hospital, T.S. was given narcotic pain medication.

56.     More than a day after arriving at the hospital, while medicated, she had a dream in which she believed that she had "re-lived" the attack. Shortly after awaking from this dream, in a phone call with her sister Ms. Cousin, T.S. first identified Mr. Moses-EL as the person who had attacked her.

57.     She was questioned about this "identification" in later legal proceedings:

Q: All right. Now, when did you identify Clarence Moses?

A: What do you mean?

Q: It was about a day or day-and-a-half after this happened, right?

A: Yeah.

Q: Okay. And what were the circumstances that you realized that that's who it was?

A: Well, I didn't know his name. I had to find out his name first.

Q: Well, you knew him by his nickname, right?

A: Yeah.

Q: Well, you had also said earlier that it was L.C.?

A: Right.

Q: And you said it was Darnell?

A: Right.

Q: And you said it was Earl?

A: Right.

Q: And at some point later on that you made the decision that it was Clarence?

A: Right.

Q. What happened that changed your mind?  Were you still in the hospital at that time?

A. Yes.

Q. Okay.  Would it be true to say that at some point you had a dream and you relived it?

A: Right.

Q: And that's when you realized it was Clarence?

A: Right.

Q: And it wasn't until that time, right?

A: Well, I knew before, but it wouldn't come out.

Q: Okay.  It came in the dream?

A: Well, it came after when I woke up, and it happened in my sleep.[3]

---

[3] T.S. Trial Testimony, Tr. 04/05/88, pp. 91-92.

58.    No other witness tied Mr. Moses-EL to the attack on T.S.  Nor was there any physical evidence that connected him to the attack.  The only evidence tying Mr. Moses-EL to these crimes was T.S.'s dream.

59.    It was implausible that a reliable memory would come to a medicated victim in a dream many hours after the attack and after she said she did not see the perpetrator and then identified other men.

60.    Additionally, it was well known that there was hostility and animosity between T.S. and Mr. Moses-EL's then-girlfriend, Stephanie Burke.

61.    T.S. and Ms. Burke had had several heated altercations in public concerning the relationship between their two small children.  T.S. had accused Ms. Burke's son Anthony (age 3) of having bullied T.S.'s son (age 2).  On at least one occasion, this hostility had erupted into a physical fight between the two women.

62.    T.S. knew Mr. Moses-EL only through his association with Ms. Burke.  At Mr. Moses-EL's preliminary hearing, when asked how she knew Mr. Moses-EL, T.S. responded, "'Cause he always comes walking past the house, him and his girlfriend," referring to Ms. Burke.

63.    The hostility between T.S. and Ms. Burke became even more apparent during the preliminary hearing, when T.S. went so far as to accuse Ms. Burke of having served as the lookout for the crime.  T.S. had not made this accusation previously, and it

was false.  When asked by defense counsel whether she had told the police this, T.S.

replied, "I don't know.  I don't know.  I don't remember."

64.    Defendant Huff, assigned to investigate the sexual assault on T.S., later

made a sworn statement expressing his doubts about the validity of T.S.'s identification

of Mr. Moses-EL.  The neighborhood feud was "a red flag" for him.  At the time of the

initial investigation, he conveyed his concerns to the Denver DA's Office about whether

T.S.'s identification of Mr. Moses-EL was the product of neighborhood drama.

**C.     Failure to Adequately Investigate the Crimes Against T.S.**

65.    The Denver Police Department, including Defendant Huff, and the Denver

DA's Office did not ever fully believe T.S.'s account of the crimes against her.  For

example, although T.S. claimed that Ms. Burke had served as a lookout for Mr. Moses-

EL—which, if true, would have made Ms. Burke an accomplice to the crimes—the

Denver Police Department did not arrest Ms. Burke, and the Denver DA's Office never

charged Ms. Burke in connection with the attack on T.S.

66.    Despite their justified skepticism about the accuracy of T.S.'s identification

of Mr. Moses-EL, once Mr. Moses-EL had been arrested and charged, the Denver Police

Department, including Defendant Huff, and the Denver DA's Office stopped

investigating the identity of the perpetrator of the crimes against T.S. pursuant to

Denver's custom of failing to search for the truth in criminal investigations and

prosecutions and using unconstitutional tactics to preserve convictions.

67.     On information and belief, the Denver Police Department, including Defendant Huff, and the Denver DA's Office never investigated L.C. Jackson, Earl, or Darnell as potential suspects in the attack on T.S., despite being aware of the following facts: (i) these three men were at the party drinking with T.S. that night; (ii) when T.S. initially spoke to the responding police officer and explained that she had not gotten a good look at her attacker because it was dark, she described the attacker's hairstyle and said it was like the hairstyles of L.C. and Earl; and (iii) at the hospital, before her dream-induced identification of Mr. Moses-EL, when asked by her sister and the police who had committed the attack, T.S. repeatedly identified L.C., Earl, and Darnell.

68.     In late August 1987, had the Denver Police Department, including Defendant Huff, done their job and adequately investigated L.C. Jackson as a suspect in the crimes against T.S., they would have seen that he had been prosecuted as an adult for a prior sexual assault in 1984 near Sloan's Lake,[4] and they would have seen references to him having committed other sexual assaults when he was a juvenile.

69.     Mr. Jackson claimed that the victim of his 1984 sexual assault had consented.

70.     In 1987, had the Denver Police Department, including Defendant Huff, made any attempt to inquire where Mr. Jackson was during the time T.S. was attacked, they would have learned that he was gone from Ms. Sanders's home during the time of

---

[4] Denver District Court Case No. 1985CR57—the Denver DA's Office allowed Mr. Jackson to plead down to a non-sex misdemeanor.

the attack two doors down.  Ms. Sanders could have told them that Mr. Jackson had left her home—purportedly to visit his grandmother—approximately 20 minutes after T.S. left the party, and that he then returned to Ms. Sanders's home about 10-15 minutes before the neighborhood was alerted to the attack.  They could have also interviewed Mr. Jackson's grandmother to determine whether he lied to Ms. Sanders about having visited her that night around 2:30 or 3:00 am.

71.     On November 2, 1987—before Mr. Moses-EL's case went to trial—Mr. Jackson burglarized his aunt's home in Denver.  In this burglary, Mr. Jackson targeted the familiar home of a woman alone, entered through a window, and went to an upstairs bedroom and stole jewelry, which he later tried to sell for cash to buy crack cocaine.

72.     The Denver Police Department investigated this burglary case of Mr. Jackson's.  Defendant Carroll, then a Denver Police Department Detective, was the lead investigator on the case.

73.     The Denver DAs' Office prosecuted Mr. Jackson for this burglary.

74.     In 1988, Mr. Jackson was convicted of second-degree burglary for this crime and sentenced to 8 years in prison.[5]

75.     Notwithstanding Mr. Jackson's burglary of his aunt's home less than three months after the attack on T.S. that shared some similarities with that crime, on information and belief, neither the Denver Police Department, including Defendant Huff,

---

[5] Denver District Court Case No. 1988CR64.

nor the Denver DA's Office revisited the question of whether it was Mr. Jackson and not

Mr. Moses-EL who had committed the crimes against T.S.

76.     Pursuant to Denver's custom of failing to search for the truth in criminal

investigations and prosecutions and using unconstitutional tactics to preserve convictions,

the Denver Police Department, including Defendant Huff, and the Denver DA's Office

maintained a laser-focus on Mr. Moses-EL as the supposed perpetrator of the attack on

T.S., and therefore failed to adequately consider the significance of Mr. Jackson's

burglary.

77.     Also, had the Denver Police Department, including Defendant Huff, and

the Denver DA's Office investigated T.S.'s case properly by treating Mr. Jackson as a

potential suspect, he would not have been left at liberty to burglarize his aunt's home.

78.     As a further example of how the Denver Police Department, including

Defendant Huff, and the Denver DA's Office stopped investigating the identity of the

perpetrator once Mr. Moses-EL had been arrested and charged, upon information and

belief, they failed to investigate T.S.'s boyfriend as a suspect, despite knowing that T.S.

had said he had previously broken her arm, and she was afraid he would kill her.

**D.     There Was No Probable Cause to Arrest and Prosecute Mr. Moses-EL.**

79.     There was no physical evidence tying Mr. Moses-EL to the crimes against

T.S.

80.     The attack occurred in the middle of the night, in the dark.  T.S. was

heavily intoxicated from drinking malt liquor to the point that she had vomited.  She was

severely nearsighted, but not wearing her glasses.  She was beaten on the head and face, suffering broken bones and massive swelling around her eyes.

81.     T.S. initially told police on the scene she had not gotten a good look at the perpetrator because the lights were out.

82.     The limited physical description given by T.S.—black male, wavy hair slicked back with grease—did not match Mr. Moses-EL.  Mr. Moses-EL had very short, buzz-cut hair that could not be slicked back, and he did not wear grease in it.

83.     This hairstyle described by T.S. did match—according to her—the hairstyles worn by L.C. Jackson and his brother Earl.

84.     Before her medicated dream in which she believed she re-lived the attack, when asked who had attacked her, T.S. repeatedly identified L.C., Earl, and Darnell.

85.     L.C. Jackson also left his girlfriend's home at the time of the attack and had a history of committing sexual assaults.

86.     Mr. Moses-EL had no history of committing any sexual crimes.

87.     The *sole evidence* tying Mr. Moses-EL to the attack on T.S. was her dream-induced identification of him more than a day after the attack, when she was in the hospital on prescribed narcotics.

88.     On the night of the attack, a rape kit was performed on T.S. at the hospital to collect biological evidence of the sexual assaults.  Vaginal swabs collected from T.S. were later tested by the Colorado Bureau of Investigation.  Analysis of these swabs

indicated the presence of significant concentrations of semen and sperm.  ABO blood

typing was conducted on the evidence samples.  The only blood type detected was O,

which was consistent with T.S., who is a Type O secretor, meaning that antigens

reflecting her O blood type are found in her other bodily fluids.  This blood type is

inconsistent, however, with Mr. Moses-EL, who is a type B secretor, meaning that

antigens reflecting his B blood type are found in his other bodily fluids, including semen.

89.    The Denver Police Department, including Defendant Huff, and the Denver

DA's Office knew of the lack of physical evidence against Mr. Moses-EL and the

unreliability of T.S.'s identification of him but arrested and prosecuted him for these

serious crimes nonetheless.

90.    On information and belief, the decision to bring Mr. Moses-EL to trial for

the attack on T.S. was based in large part on the conclusions made by Defendant Brown-

Dressel that no man including Mr. Moses-EL could be excluded by the forensic serology

test done on the evidence from T.S.

**E.    Mr. Moses-EL's Unlawful Arrest and First Trial.**

91.    Despite the complete lack of physical evidence implicating Mr. Moses-EL

and the obvious unreliability of T.S.'s identification of him, Mr. Moses-EL was arrested

on August 18, 1987, while riding a bike with his 3-year-old son.

92.    L.C. Jackson was never investigated as a suspect nor arrested in connection

with the attack on T.S.

93.     Knowing he was innocent, from the moment he was arrested Mr. Moses-EL began calling for the collection and testing of biological evidence to exonerate himself.

94.     Despite Mr. Moses-EL's repeated requests for DNA testing, Mr. Moses-EL's deputy public defender failed to obtain DNA testing of the biological evidence in the rape kit and the clothing seized from T.S.'s home.  His reason for this failure was because the prevailing view among the leadership in the public defender's office at that time was that DNA testing generally benefitted prosecutors and the admission of evidence of such DNA testing should be opposed in every case.

95.     Mr. Moses-EL was charged with first-degree sexual assault, second-degree burglary, and second-degree assault.

96.     On the night of the assault, vaginal swabs were collected from T.S. and later tested by Denver Police Department forensic serologist Defendant Brown-Dressel.[6] Analysis of these swabs indicated significant concentrations of semen and sperm. Defendant Brown-Dressel conducted ABO blood typing on the evidence samples.

97.     On or around October 7, 1987, after having analyzed the biological evidence in the crimes against T.S., Defendant Brown-Dressel reported at least to Detective Huff—and on information and belief to prosecutors at the Denver DA's Office—"that the suspect, Clarence Moses[-EL], is a B secretor, and is 1 + 1+ and that the tests are not conclusive either way."  In a report, Detective Huff said that "[Defendant

---

[6] At the time of Mr. Moses-EL's first trial, Defendant Brown-Dressel went by the name of Dr. Kathren Brown.

Brown-Dressel] states she cannot say by the tests that the suspect did or did not do the offense."

98.     The analysis provided by Defendant Brown-Dressel regarding the results of the serological testing was key in the determination of the prosecution of Mr. Moses-EL. Indeed, District Attorney Norman S. Early, Jr., in his September 1987 request to the Denver County District Court for the collection of blood and saliva samples of Mr. Moses-EL while he was incarcerated, explicitly stated that "[t]he samples requested will be of material aid in ascertaining whether the defendant herein was the perpetrator of the alleged sexual assault: as Dr. Kathy Brown can compare the defendant's samples of blood and saliva to the samples found at the time of the medical exam of T.S."

99.     In Defendant Brown-Dressel's laboratory notes—created before the first criminal trial of Mr. Moses-EL and utilized by the prosecution—where she records her serological testing and analysis on the biological evidence in this case, she said "Results—can't exclude anybody."

100.     On information and belief, Defendant Brown-Dressel's pre-trial reports, statements, and analysis in which she deliberately excluded exculpatory information that she reported to Detective Huff and others, including Mr. Moses-EL's defense counsel, served as an instrumental reason for the prosecution of Mr. Moses-EL.

101.     However, Defendant Brown-Dressel knew well-before trial, when she could have amended her report and analysis relied upon for the prosecution of Mr.

Moses-EL, that the test she used was highly sensitive and was capable of detecting even a weak foreign antigen in an evidence sample.  She used a technique called "absorption inhibition," which was the most sensitive test available for the detection of blood antigens.  Defendant Brown-Dressel used this test specifically to ensure that if there was B antigen present in the evidence sample, she would detect it.

102.    Just a few weeks before testifying at Mr. Moses-EL's first trial, in a different case, Defendant Brown-Dressel successfully detected a weak foreign male antigen (in that case, A antigen) amongst a large amount of H antigen in an evidence sample.  In that earlier case, she was able to use absorption inhibition to determine a "weak" presence of a foreign blood type, which she then used to identify perpetrator.

103.    Mr. Moses-EL is a strong secretor which means that he secretes a large amount of antigen into his bodily fluids, including semen.  This means that it is even more likely that if Mr. Moses-EL was the donor of the semen from the biological evidence in this case, B antigen would have been found.

104.    At the time Defendant Brown-Dressel conducted the analysis in Mr. Moses-EL's criminal case, the technology existed and was widely used to determine whether a donor was a strong or weak secretor.  Defendant Brown-Dressel could and should have known that Mr. Moses-EL's was a strong secretor and that this information made it more likely that if he was the donor of the semen she would have seen B antigen in her testing.

105.    The fact that Defendant Brown-Dressel knew that her absorption inhibition technique could detect even a "weak" presence of a foreign blood type—which she did not detect in Mr. Moses-EL's case—was favorable and exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963), that the Denver DA's Office was obliged to disclose to Mr. Moses-EL or his attorneys, but did not disclose.

106.    Thus, although Defendant Brown-Dressel knew: (i) that the samples in Mr. Moses-EL's case should have included blood-type antigens from a male contributor (since a large amount of semen was present); (ii) that the absorption inhibition technique she used was capable of detecting even a weak presence of a foreign blood type; and (iii) antigens indicating Mr. Moses-EL's blood type were not detected, she knowingly and with reckless disregard for the truth provided analysis for the prosecution in Mr. Moses-EL's first criminal case that Mr. Moses-EL could not be excluded as the perpetrator of the crimes against T.S.

107.    Given the sensitivity of the absorption inhibition test, the fact that male seminal fluid was present in large quantities, and the fact that Mr. Moses-EL was a strong secretor, if Mr. Moses-EL been the contributor of that semen, then antigens indicating his blood type would have been detected.  The appropriate scientific conclusion based on these facts is not that the test was inconclusive.  The appropriate scientific conclusion based on these facts was that Mr. Moses-EL was most likely not the donor of that semen and should have been excluded as the contributor of that semen.

108.   Pursuant to the pattern and practice of Defendant City and County of Denver of securing prosecutions with reckless disregard for the truth and using the full force of its authority to cover up wrongful convictions, there were no procedures in place to ensure that serologists undergo any further testing or investigation when initial analysis return results that were supposedly inconclusive.

109.   Mr. Moses-EL's first jury trial was from April 4-7, 1988.

110.   Defendant Brown-Dressel left the employment of the City and County of Denver on February 5, 1988, and began working for the Colorado Bureau of Investigation.  By the time of the first trial, Defendant Brown-Dressel was working as a forensic serologist with the Colorado Bureau of Investigation.

111.   The Denver DA's Office presented expert testimony from Defendant Brown-Dressel related to the information in her reports, explaining that T.S. was an O secretor and Mr. Moses-EL was a B secretor, meaning that they each secrete antigens indicating their blood type into their bodily fluids, such as vaginal fluid or semen.

112.   Defendant Brown-Dressel explained that there was no B antigen detected in the evidence samples recovered from T.S.  She did find evidence of an O secretor, which was consistent with T.S.'s blood type.

113.   Defendant Brown-Dressel opined that the absence of B antigens in the samples collected from T.S. did not mean that Mr. Moses-EL could not be the perpetrator and that she could not "exclude any males from depositing that seminal fluid."

28

Defendant Brown-Dressel told the jury that because the blood group detected on the evidence sample matched that of T.S., she could have been detecting antigens only from T.S. and not also antigens from the male perpetrator.  Therefore, she opined that *no male* could be excluded from being the source of the sperm, and all she could conclude from the biological evidence was that there had been evidence of sexual activity with a male.

114.    Mr. Moses-EL's public defender did not challenge this conclusion by presenting a defense serology expert to testify that because Mr. Moses-EL is a B secretor, one would expect to find evidence of his blood type in his bodily fluids, including his semen.

115.    A defense expert reviewing the information decades later, considering the knowledge available in 1987-88, concluded that there was 93% detectability in this scenario, meaning that it was *highly* unlikely that if Mr. Moses-EL's antigen was present, it would not have been detected.  A different expert later said, similarly considering the knowledge available in 1987-88, upon review of Defendant Brown-Dressel's work in Mr. Moses-EL's case "[t]he fact that Dr. Brown[-Dressel] did not find the B substance indicated, very strongly, that Mr. Moses[-EL] was not the donor of the semen."  This expert further noted that "Dr. Brown[-Dressel]'s failure to mention that the defendant was effectively excluded as the donor of the semen on the vaginal swab was, at best, disingenuous … such a failure to disclose is both quite disturbing and scientifically improper."

116.    As of 1987, Defendant Brown-Dressel had testified as an expert in the field of forensic serology at least 250 times.

117.    Information about the proper interpretation of results obtained in this case —that Mr. Moses-EL should have been excluded as the perpetrator of the crimes against T.S. based on the serological evidence—was easily available and found in standard tests on forensic serology before Dr. Brown's analysis, including "Proceedings of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence," published by the Federal Bureau of Investigation in 1983, and "The Sourcebook in Forensic Serology, Immunology, and Biochemistry" by Dr. R. E. Gaensslen, published by the U. S. Department of Justice (1983).

118.    Given Defendant Brown-Dressel's qualifications and experience, as well as her previous testimony where she recognized the significant inferences that could be deduced by results such as those described above, her gross mischaracterization of the serological evidence in this case as inconclusive with respect to the question of whether Mr. Moses-EL was the perpetrator was malicious.

119.    Defendant Brown-Dressel knew that the test results in Mr. Moses-EL's case actually provided significant exculpatory information, but she deliberately mischaracterized the results to Detective Huff, prosecutors, and defense counsel prior to trial as nothing more than inconclusive—thereby causing his prosecution.  Defendant

Brown-Dressel then continued her deliberate mischaracterizations of the test results in front of the jury at Mr. Moses-EL's first criminal trial.

120.   Moreover, even if she deemed the serology results inconclusive, Defendant Brown-Dressel, should have performed DNA testing.  At that time she knew of the existence of DNA testing, and she knew that such a test could have conclusively exonerated Mr. Moses-EL.

121.   Even assuming *arguendo* that Defendant Brown-Dressel believed the serological test results to be inconclusive, pursuant to Denver's custom of failing to search for the truth in criminal investigations and prosecutions, and using unconstitutional tactics to achieve and preserve convictions, she failed to perform DNA testing, which she was well aware *could* have definitively excluded Mr. Moses-EL as the perpetrator of the crimes against T.S. to her satisfaction.

122.   Despite the fact that Defendant Brown-Dressel did sometimes express her opinions regarding the best tests to be conducted to officers or prosecutors, even requesting particular kinds of testing be done in some cases, she did not make any effort whatsoever to pursue DNA testing in Mr. Moses-EL's case, thereby furthering Denver's deliberate disregard of the search for the truth in this case.

123.   In 1987 and 1988, the Denver Police Department's Forensic Laboratory had no standard operating procedure or formal scientific analytical method for serology procedures to ensure consistent and reliable scientific testing and analysis.

124.   On information and belief, in 1987 and 1988, the Denver DA's Office had no policy requiring that additional scientific tests of biological evidence be conducted when the sole test done was reportedly "inconclusive."

125.   Standard operating procedures in a crime lab are necessary to ensure good scientific practice and consistent procedure and allow other scientists to revisit tests and look at exactly what was done in any particular case.

126.   Because there was no standard operating procedure, Defendant Brown-Dressel was not required to request a DNA test for the evidence in Mr. Moses-EL's case or to formally report the decisions she made about which scientific tests to perform.

127.   Because the Denver Police Department did not have standard operating procedures or requirements for methodical documentation, Mr. Moses-EL's defense teams were constrained in their ability to question the reliability of Defendant Brown-Dressel's tests and conclusions and provide him a vigorous defense.

128.   Given the lack of oversight and procedures in place at the Denver Police Department Crime Lab, Defendant Brown-Dressel had an "old trick of beefing up the numbers by assigning new case numbers," whereby she would improperly assign each piece of evidence an entire new case number (instead of classifying them each under their appropriate single case number), which would make it seem like she had worked on more cases than she actually had.

129.    Despite T.S.'s earlier statements that it was dark and she could not get a good look at her attacker, she testified at Mr. Moses-EL's first trial that she had three separate opportunities to view her attacker.

130.    Mr. Moses-EL did not testify in his defense.

131.    On April 7, 1988, Mr. Moses-EL was convicted of first-degree sexual assault, second-degree burglary, and second-degree assault.

132.    On March 17, 1989, he was sentenced to 48 years on the sexual-assault conviction and 16 years each on the other two convictions, to be served concurrently, for a total cumulative sentence of 48 years in prison.

**F.    Due to the Failure to Adequately Investigate Mr. Jackson as a Suspect, He Continues to Commit Crimes.**

133.    While Mr. Moses-EL sat in prison for crimes he did not commit, Mr. Jackson was at liberty to continue committing crimes.

134.    Sometime around 1992, Mr. Jackson held his then-girlfriend D.Y.H.[7] down on her bed and choked her nearly to death, so hard that the blood vessels in her eyeballs burst.  He also stole items from her home.

135.    In 1992, about a mile away from the location where T.S. had been beaten, sexually assaulted, and choked by a male intruder while her boyfriend was out of state, Mr. Jackson viciously raped a middle-aged woman and her nine-year old daughter in

---

[7] Because D.Y.H. is a crime victim, the Amended Complaint refers to her by her initials.

their respective bedrooms in the upstairs of their home at around 2:30 a.m. while the woman's boyfriend was in jail.

136.    At the time of these 1992 sexual assaults of the mother and daughter, Mr. Jackson was staying with his then-girlfriend D.Y.H, who was a neighbor of theirs and indeed lived in the same low-income housing project as them.

137.    It was generally known in the neighborhood that the mother's boyfriend was in jail at the time.

138.    Mr. Jackson choked the mother and sexually assaulted her both vaginally and orally.  At one point during the sexual assault, he placed a pillowcase over her head. He told her to "shut up."  And he reeked of malt liquor.

139.    Mr. Jackson forcibly moved the mother downstairs and tied her up in the basement.  He scattered the contents of her purse and stole items of value.

140.    Three young children (including the nine-year old sexual assault victim) were in the house at the time of the attacks.  Mr. Jackson sexually assaulted the nine-year-old girl on her bed while her younger brother was present in a crib in the same bedroom.

141.    Mr. Jackson also banged the girl's head against the headboard, injuring her head.

142.    These 1992 crimes remained unsolved for more than a decade.

**G.      Mr. Moses-EL's Relentless Efforts to Exonerate Himself.**

143.    Meanwhile, Mr. Moses-EL continued to advocate from prison for the evidence in his case to be tested for DNA, which would conclusively prove his innocence.

144.    In August 1992, Mr. Moses-EL filed a pro se motion under Rule 35(c) of the Colorado Rules of Criminal Procedure based in part on a claim of ineffective assistance of counsel because his public defender had failed to obtain DNA testing prior to trial.  The motion was denied without a hearing.

145.    On September 30, 1993, the Colorado Court of Appeals reversed the denial of Mr. Moses-EL's Rule 35(c) motion without a hearing, and the case was remanded for a hearing on his claim of ineffective assistance of counsel for failure to have DNA testing performed on certain crime scene samples and to determine whether those samples were still available for testing.

146.    On November 11, 1993, the Denver Police Department made an inquiry regarding the availability of evidence in the 1987 sexual assault of T.S.  This inquiry revealed that the evidence was still in the possession of the courts.  On November 20, 1993, the evidence was reentered into the Denver Police Department's Property Bureau to evaluate if there was DNA present for analysis.  This was reported to Defendant Huff on November 20, 1993.

147.    Mr. Moses-EL's defense counsel requested that the Denver DA's Office and the Denver Police Department preserve the evidence so that Mr. Moses-EL could

hire a laboratory to conduct DNA testing.  It was then agreed among Mr. Moses-EL's

defense counsel, the Denver DA's Office, and the Denver District Court that the items

would be held pending Mr. Moses-EL obtaining the funds for such testing.

**H.     The Destruction of Evidence That Would Have Exonerated Mr. Moses-EL.**

148.    Mr. Moses-EL, an indigent prisoner, began raising money from other

inmates to conduct the DNA testing.  Inmates convicted of sexual assault generally take

huge precautions to conceal their crime of conviction because such offenders are targets

of violence and exploitation by other prisoners.  Putting himself in clear danger, Mr.

Moses-EL told other prisoners that he was imprisoned for a sex-assault conviction.  He

explained that he had been wrongly convicted and was trying to raise money to obtain a

DNA test to clear himself.

149.    Mr. Moses-EL understood the risks of disclosing the nature of his

conviction.  He further knew that if he received money from other inmates for a DNA test

that failed to exonerate him, he would be targeted not only as a sex offender but also as a

liar who had taken other inmates' money on false pretenses.  But Mr. Moses-EL knew he

was innocent and trusted that DNA testing would exonerate him, so he sought funds from

his fellow prisoners.

150.    Mr. Moses-EL successfully raised the $1,000 he needed for a DNA test.

151.    In May 1995, Defendant Robin Whitley, the Deputy Denver District

Attorney assigned to Mr. Moses-EL's case, contacted Ann Perry, a civilian employee

forensic serologist in the Denver Police Department Crime Laboratory, and asked her to

determine whether the crime-scene samples were still available.  Defendant Whitley

instructed Ms. Perry to preserve the samples if they were still available.

152.    In an undated note between Ms. Perry and another Denver Police

Department serologist Jeanne Kilmer, Ms. Kilmer asked Ms. Perry to determine whether

or not Mr. Moses-EL's DNA evidence was "still [t]here and could be tested."  Ms.

Kilmer said that she asked another Denver Police Department Official, Doug Jewell:

> to check there and see if they are still over [at the court]
> somewhere…Also, I asked him to check on possible OTHER
> CASE numbers that relate to this case – Kathy [Brown-
> Dressel's] old trick of beefing up the numbers by assigning
> new case numbers…Mark Olin is aware of this deal and
> Doug may talk to him directly – but I wanted you to be aware
> of it in case he calls you and wants you to dig around trying
> to find the stuff!

153.    In July 1995, Ms. Perry determined that the samples were still available.

She packaged them for shipping by putting them in a sealed box and marked the package

"DO NOT DESTROY" in bolded sharpie marker.  On July 19, 1995, Ms. Perry made the

following computer entry in the Denver Police Department property section inventory

system relating to the invoice under which the samples were held: "Hold for DA Robin

Whitley."

154.    After packaging the samples and making the computer entry, Ms. Perry left

the samples in the Denver Police Department Property Management Bureau and had no

more contact with the samples.

155.    Despite the fact that Ms. Perry was aware that the investigating detective—in this case Defendant Huff—had final say on the destruction of evidence, she did not contact Defendant Huff to inform him of the need to preserve the evidence samples.

156.    Defendant Whitley conducted no follow-up to ensure that the evidence that was "available" would be preserved.  Defendant Whitley did not contact Defendant Huff to inform him of the need for preservation of this evidence, thereby furthering Denver's deliberate disregard of the search for the truth in this case.

157.    On or about October 5, 1995, Denver Police Department Property Management Bureau Technician R. Cubbage sent to Defendant Huff, as part of Technician Cubbage's routine duties, a computer printout requesting instructions regarding the disposition of the property held under a numbered invoice that included the evidence samples for the attack on T.S.  Technician Cubbage later stated he was unaware of any actions by Defendants Whitley and Ms. Perry to preserve the samples.

158.    The Denver Police Department had no policies in place to ensure that physical evidence that was *supposed* to be preserved was *actually* being preserved.

159.    Defendant Huff testified that in determining whether the property identified in an invoice from Technician Cubbage should be held, destroyed, or sold, Detective Huff looked only at the date on the invoice.  On October 11, 1995, Defendant Huff looked at the invoice from Technician Cubbage, saw that it was for a case dated August

38

16, 1987, and concluded that since the evidence was from a 1987 case, it would no longer be needed.  Defendant Huff therefore marked the invoice for disposal.

160.   Because the Denver Police Department had inadequate evidence-preservation procedures in place, Defendant Huff did not look at the "comments" section of the invoice from Technician Cubbard.  Had he done so, he would have seen the comment that stated: "HOLD FOR DA ROBIN WHITLEY":



*Exerpt of Inventory Sheet Marked by Defendant Huff*
*(comment highlighted, victim information redacted)*

161.   Defendant Huff had the final say on destruction of evidence he was responsible for overseeing, and his decision was not reviewed before it was carried out.

162.   Defendant Huff would later testify that in his experience, when there have been "holds" on evidence, he has been directly contacted by the DA or someone else who was requesting the hold to inform him about it.  He testified that he was not contacted by Ms. Perry or Defendant Whitley regarding the need to hold the evidence in Mr. Moses-EL's case.

163.   Defendant Huff later testified that he was unaware that the case was active—even though he had been sent a memorandum on November 20, 1993, stating that the evidence was being reentered into the Denver Police Department's Property Bureau to evaluate if there was DNA present for analysis.

164.   On October 17, 1995, just six days after Defendant Huff had directed Technician Cubbage to destroy the evidence, Ms. Perry wrote Defendant Whitley a memorandum advising him that a sealed box containing the rape kit of samples collected from T.S. and the clothing to be tested was "available" in the Denver Police Department Property Bureau.

165.   On information and belief, Ms. Perry drafted and circulated this memorandum without first checking on the preservation of the evidence.  Had she done so, she would have seen that this evidence was in the process of being destroyed.

166.   The Denver Police Department did not have a policy in place to ensure that all relevant individuals were aware when evidence should not be disposed of.  If such a

policy had been in place, Ms. Perry would have checked on the evidence before circulating her October 17, 1995 memorandum.

167.   The Denver Police Department also did not have a policy in place requiring Detectives in charge of making decisions about evidence disposal to check with case prosecutors before authorizing the destruction of evidence.

168.   The Denver DA's Office also did not have a policy in place to ensure that prosecutors directly contact the detectives responsible for the disposition of evidence in their cases regarding court orders and other requests for evidence preservation.

169.   On October 26, 1995, Defendant Whitley wrote a letter to Mr. Moses-EL's defense counsel advising him that the evidence was available to be picked up from the police department upon the Court's signing of the order authorizing it.

170.   Defendant Whitley made no effort at this juncture to ensure that the evidence that was "available" would be preserved, thereby furthering Denver's deliberate disregard of the search for the truth in this case.

171.   On November 2, 1995, the prosecution and defense entered into a stipulation for the release and shipping of the rape kit and clothing to a lab in California for defense DNA testing.  On the same day, the Denver District Court entered an Order for the release and testing of the evidence.  The Order required the defense to ship the evidence promptly by Federal Express.

172.    DNA testing of this evidence would have shown that Mr. Moses-EL was not the individual who assaulted T.S.

173.    The evidence was available for pickup on November 2, 1995.

174.    As Defendant Whitley and the Denver DA's Office were aware, in order to maintain a secure chain of custody, Mr. Moses-EL's defense counsel wanted to include a saliva sample from Mr. Moses-EL with the crime-scene evidence samples it was supposed to pick up from the Denver Police Department and directly send to the DNA laboratory in California.  The procurement of an untainted saliva sample from an incarcerated person can take time to facilitate, and the defense team was awaiting Mr. Moses-EL's transfer to a Denver facility for the purpose of collection.  Thus, the defense did not immediately pick up the evidence from the Denver Police Department because they were not ready to send the evidence to the lab by Federal Express since they had not yet been able to obtain the saliva sample from Mr. Moses-EL.

175.    On or about December 3, 1995, Technician Cubbage, acting according to standard procedure, retrieved the invoice for the evidence in Mr. Moses-EL's case and other invoices indicating that their respective evidence should be destroyed.  He then retrieved all of the property to be disposed of from the bins in the Denver Police Department Property Bureau and put all the property on a flatbed.  From there, all of the property marked for destruction—and Mr. Moses-EL's only chance to conclusively prove his innocence through DNA testing—went to a trash dumpster and was destroyed.

176.    Technician Cubbage later testified that his job duties at the Denver Police Department Property Bureau vis a vis the disposition of property were merely to identify items designated for disposal by the assigned detective by invoice number and then proceed with the disposal as directed.

177.    No Denver Police Department policy was in place that would have required Technician Cubbage to read the comments section of the computer printouts or to inspect individual items of evidence for preservation notations.  Therefore, Technician Cubbage simply referred to the detective's decision as marked on the invoice and carried it out.

178.    On or about January 24, 1996, Defendant Whitley first became aware that the evidence samples in Mr. Moses-EL's case had been destroyed.

179.    Shortly thereafter, Mr. Moses-EL received a letter notifying him that the evidence he had been pleading for years and years to have tested for DNA had been recklessly destroyed.

180.    Mr. Moses-EL later described that moment: "I literally broke down in the cell.  I said, 'Man, I know that didn't happen.'  I was blown away.  Broken.  I felt like a person who was given cement shoes and thrown in the water just to sink."

181.    No one connected with the evidence destruction in Mr. Moses-EL's case was ever reprimanded or disciplined.

I.      **The Denver Police Department's and the Denver DA's Office's Pattern of Mishandling Physical Evidence.**

182.    On February 22, 1996, Lamar Sims, then a Chief Deputy District Attorney at the Denver DA's Office in charge of Police Liaison/Administration, sent a memorandum to Lieutenant Elizabeth Walter, Commander of Denver Police Department's Property Management Bureau, and Daniel O'Hayre, Division Chief, Staff Services Division regarding the subject of "Property Bureau Issues."

183.    Mr. Sims's memorandum said, *inter alia*: "Following my brief telephone conversation with Division Chief O'Hayre, a couple weeks ago, I received information from deputies and staff about some troubling incidents involving property seized as evidence.  The precipitating incident involves evidence in [Mr. Moses-EL's criminal case] … .  When this incident was brought to the attention of our supervisors, additional staff members related other recent issues.  *One* of those incidents involved the release, to the Colorado Springs P.D., of a weapon used in an aggravated assault in Denver, while our cases were still pending…"  (Emphasis added.)

184.    In her March 1, 1996, reply to Mr. Sims, Lt. Walter began by stating she had reviewed Mr. Sims's memorandum and she had spoken with him "and expressed [her] desire to assist him and others in the formulation of a better system."  Lt. Walter went on to say that "[a]s you know, our position in Property is custodial in nature.  We do not judge or determine an officer or detective's action, but carry out the directions given.  In the cases cited by Mr. Sims, communications problems occurred between either the

detectives and the Assistant Deputy District Attorney or detectives from two different bureaus."

185.    In this correspondence, Lt. Walter proceeded to describe not only the destruction of evidence in Mr. Moses-EL's case that had occurred at the Denver Police Department Property Bureau but also the separate loss of other biological evidence from the case: refrigerated samples of saliva and blood that had been kept at a laboratory.

186.    Lt. Walter's correspondence explained that in 1987, Defendant Huff had placed two tubes of blood and three tubes of saliva for Mr. Moses-EL's case under Invoice #358430.  Her records of this invoice show that these blood and saliva samples were placed in the "Lab" and never in the Property Bureau.

187.    She proceeded to say that although Defendant Huff had marked this evidence for destruction in 1988, it had not been destroyed.  She did not elaborate why evidence marked for destruction was not destroyed.

188.    Lt. Walter continued: "Since discovering the possible existence of the blood and saliva on February 29, 1996, I have contacted Sergeant Mark Olin and Sergeant Lester Smith.  Sergeant Smith and I were unable to find the samples.  Sergeant Olin has not informed me of any results.  Ms. Sharon Sekerak and I also checked the Pump Room, but found no obvious samples, only reports.  Thus, there is a small chance that the blood and saliva samples may still exist – if not destroyed by the lab."

189.     Lt. Walter blamed Defendant Huff for the destruction of the rape kit and

clothing to be tested for DNA in Mr. Moses-EL's case.  She noted, "[a]ccording to the

Operations Manual, officers are required to determine case dispositions and, complete the

disposal forms.  Whether the case is a minor one or a major one, the assigned detective or

input officer is responsible for the legal trail."

190.     Lt. Walter characterized the evidence-handling problems as having resulted

from a communication problem between the Denver Police Department and the Assistant

Deputy Denver District Attorney.

191.     Lt. Walter responded to the other specific incident Mr. Sims had mentioned

in another case involving weapon evidence.  At that time, standard procedures dictated

that a weapon placed in evidence is to be cleared with the National Crime Information

Center, and if a "hit" comes back, then it is forwarded to Pawnshop Records.  However,

in that case, although a weapon was placed in evidence on August 30, 1995, such a check

was not done in a timely manner, and the first "hit" was not received until January 19,

1996.  A Denver Police Department detective improperly signed the weapon out for

release to another police department, despite the fact that it was evidence in an ongoing

criminal case.

192.     In discussing that case involving the weapon, Lt. Walter notes that "[d]ue to

a personnel matter, I directed my staff to double check weapon clearances performed

prior to September, 1995.  Several previously unknown stolen weapons have been traced, as a result."

193.    Lt. Walter's correspondence also responded to the "persistent rumor of reckless destruction of controlled substances" that Mr. Simms presumably raised in his memorandum.

194.    According to a January 30, 1997, affidavit of Lt. Walter, the procedures, or lack thereof, utilized by the Denver Police Department and the Denver DA's Office were in effect and unchanged from at least 1980 to 1995.

195.    Current international professional standards for proper evidence handling suggests the use of DNA Destruction Notification letters to notify a criminal defendant and his/her attorney that biological evidence pertaining to the defendant's case will be destroyed by a specified date unless a motion is filed requesting the retention for future testing.[8]  No such process was utilized by the Denver Police Department or the Denver DA's Office in Mr. Moses-EL's case.

196.    With respect to policies concerning the disposition of evidence, "There should be special consideration given to NOT disposing of certain evidence without prosecutorial or judicial review, such as: sex crimes, capital crimes, other serious

---

[8] *See* International Association for Property and Evidence, Inc. Professional Standards, Version 2.5.1, updated November 2016, pg. 21, *available at* http://home.iape.org/resourcesPages/IAPE_Downloads/IAPE_Resources/IAPE-Professional-Standards/IAPE_Stands_2_6-2016.pdf.

felonies, and pending civil litigation."[9]  No such process was utilized by the Denver

Police Department and the Denver DA's Office in Mr. Moses-EL's case.

197.   According to standards from the National Institute of Standards and

Technology, while "[s]ound internal controls should always include the investigating

officer's input into this decision … The agency's investigations unit and/or the

prosecuting agency should be the primary decision maker(s) to determine that evidence is

no longer needed."[10]  The Denver Police Department and the Denver DA's Office did not

have such a policy in place.

198.   International professional standards for the handling of evidence provide:

> Comprehensive audits of the Property and Evidence function
> of an agency are a very important internal control that should
> be conducted at least annually by the Chief Executive Officer
> or designee.  Additionally, there should be inspections of the
> property room conducted by the supervisor, or the unit
> commander, who are responsible for that component of the
> agency … Conducting routine audits sends a message to
> everyone in the organization that property and evidence is
> important.  Failure to conduct periodic audits may lead to
> problems that can later result in criminal prosecutions being
> lost, a loss of public confidence, personnel problems and
> possible financial loss.[11]

---

[9] *Id*. at 71.
[10] *See* the Biological Evidence Preservation Handbook: Best Practices for Evidence Handlers,
National Institute of Standards and Technology & The National Institute of Justice, April 2013,
p. 38, *available at* https://www.nist.gov/document-2652.
[11] *Id*. at 78, 81.

199.    On information and belief, from 1987 to 1995, there were no such audits or inspections conducted at the Denver Police Department regarding the preservation and safekeeping of evidence.

200.    Alternatively, if there was such an audit or review, it was clearly deficient, as it did not result in a comprehensive policy to ensure that evidence required to be preserved was in fact preserved.

201.    Thus, despite the grave responsibility that comes with handling and processing evidence that determines the liberty of fellow human beings, the Denver Police Department and the Denver DA's Office had a known and concerning pattern and practice of failing to properly preserve and handle physical evidence in their custody and control.

**J.      Due to the Failure to Investigate Mr. Jackson as a Suspect, He Continues to Commit Crimes While Mr. Moses-EL Runs Out of Options to Prove His Innocence.**

202.    On April 11, 1997, Defendant Brown-Dressel wrote a report regarding her analysis of the serological evidence in Mr. Moses-EL's criminal case before his hearing under Rule 35(c) of the Colorado Rules of Criminal Procedure, detailing what her testimony at that hearing would be.  In this report, like her report before Mr. Moses-EL's 1988 criminal trial, she again deliberately mischaracterized the analysis of the evidence, stating that she could not exclude any sperm-producing male.

203.    On May 13, 1997, Mr. Moses-EL's Rule 35(c) motion was again denied by the Denver District Court.

204.    Meanwhile, in Denver around 1997, Mr. Jackson sexually assaulted the daughter of a woman he was dating at the time.  In 2003, after seeing Mr. Jackson again at a local amusement park, the girl and her mother reported the earlier sexual assault to the Denver Police Department.  The Denver Police Department never followed up on the investigation, and Mr. Jackson was never prosecuted for this crime.

205.    In late 2005—as the result of a push by the Denver DA's Office to use DNA evidence to solve crimes—Denver law-enforcement officials obtained a "cold hit" match between the biological evidence from the 1992 sexual assaults of a 42-year-old woman and her 9-year-old daughter and the DNA of Mr. Jackson (which had been collected from him in connection with his burglary conviction).

206.    On January 9, 2006, Defendant Morrissey, Denver District Attorney, issued a press release announcing that based on the DNA match, Mr. Jackson was being charged for the 1992 rapes of the Denver mother and daughter.

207.    The Denver DA's Office—under the leadership of Defendant Morrissey— and the Denver Police Department made no effort to determine whether Mr. Jackson's blood type matched the biological evidence from the rape kit in the sexual assault of T.S. for which Mr. Jackson had been identified and Mr. Moses-EL had been convicted.

208.    In May 2007, the Denver DA's Office brought Mr. Jackson to trial for the 1992 sexual assaults.  Mr. Jackson's theory of defense was that the woman had consented to sexual intercourse with him in exchange for drugs, and that the girl was lying.

209.    At Mr. Jackson's sexual-assault trial, the prosecution presented evidence that at the time of the 1992 sexual assaults, Mr. Jackson was living with his then-girlfriend D.Y.H. in the same low-income housing project as the victims, arguing that this demonstrated he knew the floor plan of the victims' home.

210.    This was *Brady* information for Mr. Moses-EL's case, given that at the time when T.S. was raped and assaulted in her own home, Mr. Jackson had been living with a girlfriend who resided in the same low-income housing project as T.S.  The Denver District Attorney was obliged to disclose this information to Mr. Moses-EL or his attorneys, but did not do so.

211.    The Denver DA's Office was also obliged to but failed to disclose to Mr. Moses-EL or his attorneys many other similarities between the 1992 sexual assaults that they knew Mr. Jackson had committed and the sexual assault of T.S.

212.    A Denver jury convicted Mr. Jackson of two counts of aggravated first-degree sexual assault, one count of sexual assault on a child, one count of second-degree kidnapping, and two habitual criminal counts.

**K.    Defendant Morrissey Claims to have Re-Opened Mr. Moses-EL's Case in Defending Himself Against Bad Publicity from The Denver Post's Coverage of the Evidence Destruction in Mr. Moses-EL's Case in its "Trashing the Truth" Series.**

213.    In July 2007, The Denver Post profiled the evidence-destruction problems in Mr. Moses-EL's case as part of its long-term investigative series, "Trashing the Truth."

214.    In response, Defendant Morrissey caused the Denver DA's Office to issue a

public statement or press release titled "Setting the Record Straight."  According to this

public statement, Defendant Morrissey "did reopen the People v. Moses case and he

personally reviewed all available material.  After completing his review, talking with the

original prosecutors and corresponding with defense counsel, he found that everything

that could be presented to a jury, or could be presented [to] a jury now, was presented at

trial and considered by the jury."

215.    This statement was not true.  For example, the fact that Mr. Moses-EL had

sought DNA testing of the biological evidence in the case was not something that was

considered by the jury that convicted him at his first trial.  Similarly, the fact that Mr.

Jackson had committed sexual assaults not far from T.S.'s neighborhood and in a similar

manner was also not something considered by the jury that had convicted Mr. Moses-EL.

**L.    Mr. Moses-EL's Opportunity for Freedom Through State Legislative Action is Torpedoed by Defendants Morrissey and Whitley.**

216.    The "Trashing the Truth" series garnered public attention to Mr.

Moses-EL's plight and the injustice of his case.

217.    On March 5, 2008, thirteen Colorado state legislators wrote a letter to

Defendant Morrissey expressing concern that Mr. Moses-EL may be an innocent man

wrongfully incarcerated.  Their letter stated, "We know of your championing of the use

of DNA in criminal cases so we know that you recognize the importance of this form of

evidence."  Based on the destruction of material evidence in Mr. Moses-EL's case, the

legislators asked Defendant Morrissey to allow Mr. Moses-EL to have a new trial or recommend some other form of relief.

218.   On March 12, 2008, State Senator Ken Gordon sponsored and introduced Senate Bill 08-205, which was inspired by the destruction of evidence in Mr. Moses-EL's case.  Introducing the bill, Senator Gordon said: "I think the founders would have been horrified to see that there could be cases where the crucial evidence in a case was destroyed by law enforcement after a court had ordered that it be tested and there was no remedy for the defendant."

219.   Senate Bill 08-205 was introduced by Senator Gordon and other legislators in response to Mr. Moses-EL's case.

220.   Senate Bill 08-205 would have required, retroactively, a new trial in any case where biological evidence that is subject to a court order for testing is destroyed, lost, or otherwise disposed of before it is tested, and it would have allowed a court to dismiss the charges if the judge found that to be the appropriate remedy.

221.   Thus, had it passed, this bill would have at a minimum helped Mr. Moses-EL obtain a new trial in 2008 or 2009.  And it may have resulted in the complete dismissal of charges instead of retrial.

222.   When Senate Bill 08-205 was filed—in its original retroactive form—it was signed by 82 House and Senate members out of 100.  With this amount of support, the vote on Senate Bill 08-205 could have overridden a veto from then-Governor Bill Ritter.

223.    On March 14, 2008, Defendant Morrissey responded to the letter from the state legislators.  He claimed that he had "re-opened the Moses case in March 2006 and thoroughly re-examined all of the evidence."

224.    In his response letter, Defendant Morrissey stated that "the victim in this case did not name 'three other suspects' before identifying her attacker."  However, at the preliminary hearing held October 27, 1987, T.S. testified that she had identified L.C., Earl, and Darnell the night she went to the hospital, before she had her dream in which she believed she had re-lived the attack and following which she first accused Mr. Moses-EL.  At Mr. Moses-EL's first trial, T.S. repeatedly reiterated under oath that she had identified these three men as her attacker.

225.    Five days later, on March 19, 2008, Defendant Morrissey appeared before the Colorado Senate Judiciary Committee to testify in opposition to Senate Bill 08-205. Defendant Morrissey repeatedly said that the bill was about one case: Mr. Moses-EL's case.  Defendant Morrissey urged committee members to vote against the bill.

226.    A champion of using DNA to obtain convictions, Defendant Morrissey began his testimony in opposition to Senate Bill 08-205 by distributing copies of his response letter to the thirteen legislators in which he had falsely claimed that the victim, T.S., had not named other suspects.

227.    Defendant Morrissey then testified—contrary to the evidence from trial— that T.S. had immediately identified Mr. Moses-EL as her attacker to others because, he

asserted, T.S.'s sister's boyfriend had supposedly confronted Mr. Moses-EL right after

T.S. arrived at the sister's house seeking help. This was untrue and contrary to the

evidence. T.S.'s sister, Denise Cousin, testified that the first time T.S. identified anyone

to her was at the hospital, when T.S. identified "Darnell, Earl and L.C." Ms. Cousin

testified that T.S. did not assert that her assailant was "Bubbles" (Mr. Moses-EL) until

"like a night after it happened." Ms. Cousin further testified that after her boyfriend (Mr.

Howard) had called the police and picked up T.S.'s children, he went to Mr. Moses-EL's

house and "asked him did he know what happened to [T.S.]."

228.    Also on March 19, 2008, Defendant Whitley testified before the Colorado

Senate Judiciary Committee against Senate Bill 2008-205. Defendant Whitley also stated

that the bill was all about Mr. Moses-EL's case, and he told legislators it would be

inappropriate for them to provide Mr. Moses-EL with a new trial.

229.    In April 2008, Defendant Morrissey appeared before the Colorado House

Judiciary Committee to again testify in opposition to Senate Bill 08-205. Despite any

facts to support his claim, Defendant Morrissey complained that Mr. Moses-EL's case

had been misrepresented by the media, the Senate, and "throughout the halls of this

building." He characterized Senate Bill 08-205 as the "revictimization bill of 2008."

230.    According to information that came to light in March 2016[12], there exist

seven pages of email correspondence dated April 30, 2008, among Defendant Morrissey,

---

[12] This information was not disclosed to Mr. Moses-EL's defense team until late March 2016 and
only then in response to a request under the Colorado Criminal Justice Records Act. Defendant

his staff at the Denver DA's Office, and his campaign manager regarding Mr. Moses-EL's case.

231.    As the Denver District Attorney, Defendant Morrissey had considerable influence with the Colorado state legislators deciding whether to pass a bill that would have provided Mr. Moses-EL with a new trial.  Defendant Morrissey willfully chose to use his position of authority and influence to spread false information about Mr. Moses-EL's case, thereby depriving Mr. Moses-EL of the opportunity to obtain his freedom.

**M.     Mr. Jackson, the True Perpetrator, Comes Forward.**

232.    On or around April 30, 2012, Mr. Jackson sent a letter to Mr. Moses-EL saying:

> I really don't know what to say to you.  but let's start by bringing what was done in the dark into the light.  I have a lot on my heart.
> I don't know who is working on this.  but have them come up and see me.  Its time.
> I'll be waiting.
>
> L.C. [sic]

---

Morrissey and the Denver DA's Office refused to disclose the contents of this lengthy email correspondence.

BRo. CLARENCE MOSE-EL

I REAlly don't Know what to say to you. but let's Start by bringing what was done in the Dark Into the light. I have Alot on My Heart.
I don't Know who working on this. but have them come up And see me. It's time.
I'll be waiting.

L.C.

233.    Mr. Jackson began making many admissions of culpability to different attorneys and investigators representing Mr. Moses-EL.  Mr. Jackson generally stated that he had left the party at Ms. Sanders's home, entered T.S.'s home, engaged in vaginal and anal sexual intercourse with T.S. (which he claimed was consensual on her part), and then hit her repeatedly in the face and head.

234.    Information detailing Mr. Jackson's admissions was provided to Defendant Morrissey.

235.    In December 2013, based on Mr. Jackson's admissions, Mr. Moses-EL filed a motion under Rule 35(c) of the Colorado Rules of Criminal Procedure asking the Denver District Court to vacate his convictions and grant him a new trial based on newly discovered evidence.

236.   On September 3, 2014, the Denver District Court granted an evidentiary hearing on Mr. Moses-EL's motion for a new trial based on newly discovered evidence. By that point in time, Mr. Moses-EL had been wrongfully imprisoned for more than 27 years.

237.   In her efforts to refute Mr. Moses-EL's newly-discovered evidence claim, Defendant Benedetti stated multiple times on the record in Mr. Moses-EL's case that the credibility of Mr. Jackson's admissions was questionable because the statute of limitations had run on the crimes at issue.

238.   At the request of counsel for Mr. Moses-EL, the Denver District Court issued a writ for law-enforcement authorities to bring Mr. Jackson from prison to court to testify as a witness for Mr. Moses-EL.

239.   On May 14, 2015, Defendant Benedetti suggested that the Denver District Court appoint counsel to represent Mr. Jackson on the ground that his contemplated testimony gave him a Fifth-Amendment privilege against self-incrimination because, Defendant Benedetti asserted, the Denver DA's Office could prosecute Mr. Jackson for kidnapping T.S., since there is no statute of limitations for bringing a kidnapping charge under Colorado law.

240.   Defendant Benedetti was aware of Mr. Jackson's admissions concerning the night T.S. was attacked, and she had no intention of prosecuting him for having kidnapped T.S.  She was well aware that Mr. Moses-EL had not been prosecuted for

kidnapping on the same set of crime facts.  And she knew that under Colorado law, a kidnapping charge would be—at best—a stretch.[13]

241.    Defendant Benedetti made the argument that Mr. Jackson faced potential liability for kidnapping in order to encourage and cause the Denver District Court to appoint counsel to advise Mr. Jackson about his Fifth Amendment privilege against self-incrimination.  This was because Defendant Benedetti expected and hoped that such counsel would strongly advise Mr. Jackson to assert a Fifth-Amendment privilege and thereby refuse to testify for Mr. Moses-EL.

**N.    Defendants Benedetti and Carroll Intimidate Mr. Jackson into Writing a False Recantation Note.**

242.    Consistent with Defendant City and County of Denver's practice of failing to seek the truth, Defendants Benedetti and Carroll intimidated Mr. Jackson into falsely recanting his prior admissions.

243.    Knowing that if Mr. Jackson testified at the evidentiary hearing on Mr. Moses-EL's motion for new trial, Mr. Jackson would likely admit his involvement in the attack on T.S., on May 11, 2015, Defendants Benedetti and Carroll visited Mr. Jackson in prison.

---

[13] *People v. Bell*, 809 P.2d 1026 (Colo. App. 1990), held that to prove the asportation element of kidnapping, where the movement of the victim is insubstantial, such as, in *Bell*, moving the victim at gunpoint from one room of the victim's house to another room of the same house, the prosecution must establish that the insubstantial movement substantially increased the risk of harm to the victim (a standard that the Colorado Court of Appeals held was not met on the facts of *Bell*).

244.    Defendant Carroll began the meeting by reminding Mr. Jackson that Defendant Carroll had been the arresting Denver Police Detective for Mr. Jackson's burglary charge in 1987—for which Mr. Jackson had received an 8-year prison sentence.

245.    Defendant Carroll also issued *Miranda* warnings to Mr. Jackson.

246.    Confused and "spooked," Mr. Jackson asked if he was under arrest.

247.    Defendant Carroll told Mr. Jackson that he could be indicted if he chose to file charges against him.

248.    Defendant Benedetti told Mr. Jackson he could face charges of perjury.

249.    Feeling intimidated by Defendants Benedetti and Carroll, Mr. Jackson reluctantly wrote a note that stated that on the night T.S. was raped, he was home with his girlfriend (Pamela "Poo-Poo" Sanders), and that he never had sex with T.S.

250.    This recantation note was false.

251.    Mr. Jackson later testified that at the time he wrote out the recantation note he thought he was potentially facing criminal charges and that these people could bring such charges against him.  Defendant Carroll had told Mr. Jackson that he could be charged with criminal charges: "it depends on how it goes."[14]

252.    According to Mr. Jackson, as soon as he wrote the brief recantation note, Defendant Benedetti "snatched it up," and she and Defendant Carroll left.

---

[14] Evidentiary Hearing Tr. 07/30/15, p. 67:4-7.

**O.     Mr. Jackson Makes Admissions of His Involvement Under Oath at the Evidentiary Hearing.**

253.    In late July and early August of 2015, the Denver District Court held the evidentiary hearing on Mr. Moses-EL's motion for a new trial based on newly discovered evidence that Mr. Jackson was the true perpetrator of the crimes for which Mr. Moses-EL had been convicted and imprisoned for nearly three decades.

254.    Mr. Jackson, having been advised by his own, court-appointed independent counsel, took the stand and testified as a witness for Mr. Moses-EL.

255.    Mr. Jackson credibly admitted under oath at the hearing that on the night T.S. was attacked, he had entered her home, had vaginal and anal sexual intercourse with her, got upset at her, and hit her multiple times in the face with his fists.

256.    Mr. Jackson explained that in 1987, he was living with his then-girlfriend Pamela "Poo-Poo" Sanders, who lived two doors down from T.S. in a low-income housing project, and that T.S.'s home had a similar layout to Ms. Sanders's home.

257.    Mr. Jackson testified that after hitting T.S., he returned to Ms. Sanders's home, and about 10-15 minutes later, they received a call from T.S.'s sister explaining that something had happened to T.S.

258.    At the evidentiary hearing, Mr. Jackson explained how he came to write the letter to Mr. Moses-EL offering to admit his involvement in the crime for which Mr. Moses-EL was imprisoned.  Mr. Jackson testified that he had prayed on the matter, which had been heavy on him for a while.  As a result of his prayer, he decided that he needed

61

to clear Mr. Moses-EL for the allegations that he was accused of.  Mr. Jackson disclosed

that his liver was failing and that he had Hepatitis C but was choosing not to be on

dialysis.  He expressed his belief that if he did not repent his sins, he did not think he

could make it into the kingdom of heaven.[15]

259.    Mr. Jackson testified that he regretted having written the recantation note

for Defendants Benedetti and Carroll and that he had done so because he felt intimidated

by them.

260.    Mr. Jackson was asked about the violent sexual crimes against the mother

and daughter in 1992 for which he had been successfully prosecuted by the Denver DA's

Office in 2006.  Mr. Jackson admitted that he had sexual intercourse with the mother, but

claimed again that it had been consensual.  Mr. Jackson testified that it was the mother

and not he who had banged the girl's head on the bed, and he claimed that the girl had

never been penetrated.

261.    Regarding the separate burglary of his aunt's house in November 1987 for

which he had received the 8-year prison sentence, Mr. Jackson admitted that he had tried

to sell his aunt's jewelry for crack cocaine.

262.    Regarding the incident at Sloan's Lake in 1984 when he was arrested for

having sexually assaulted a young woman, Mr. Jackson again claimed consent.

_____

[15] Evidentiary Hearing Tr. 07/30/15, pp. 49:14-51:11.

**P.     After Mr. Moses-EL's Convictions are Vacated, Defendants Morrissey and Kimbrough and the Denver DA's Office Intentionally Mislead the Media and the Public about the Facts of Mr. Moses-EL's Case.**

263.    On December 14, 2015, based on newly discovered evidence, the Denver District Court issued a written order vacating Mr. Moses-EL's convictions and granting him a new trial.

264.    A few days later, after spending more than 28 years incarcerated for crimes he did not commit, Mr. Moses-EL was released on bond.

265.    Within days of the district court's order granting Mr. Moses-EL a new trial, the Denver DA's Office made intentional repeatedly misrepresentations to the media bout the evidence in the case.

i)  *Defendant Kimbrough misstates to the New York Daily News that all the evidence implicating Mr. Jackson had been presented at Mr. Moses-EL's original trial.*

266.    On December 17, 2015, Defendant Kimbrough, the Communications Director for the Denver DA's Office, sent a public relations statement to Alfred Ng of the New York Daily News.  This statement said in part that "[a]ll of the evidence, including the explanation of the victim's reference to a dream, was presented to 12 Denver jurors who convicted Clarence Moses[-]El."

267.    Mr. Ng promptly wrote back, "Isn't the new evidence also that Jackson's blood type was found on the victim's clothes, but not Clarence's blood type?  Does the DA have a response to that?"

268.   The assertion contained in Mr. Ng's question was correct.  Evidence of Mr. Jackson's blood type and the fact that it is highly consistent with the rape-kit evidence in this case was not presented at Mr. Moses-EL's original trial.  When the Denver DA's Office and the Denver Police Department learned in 2005 that Mr. Jackson had raped two other victims in 1992, they did not bother to determine whether Mr. Jackson's blood type matched the biological evidence from the rape kit in the sexual assault for which Mr. Moses-EL had been convicted, thereby furthering Denver's deliberate disregard of the search for the truth in this case.

269.   It was Mr. Moses-EL's defense team who had Mr. Jackson's saliva sample tested in 2015 to determine his blood type, which is consistent with the biological evidence collected from T.S.

270.   Defendant Kimbrough responded to Mr. Ng, "Alfred, I believe that was known evidence at the original trial.  I can follow up tomorrow."

271.   Based on information and belief, Defendant Kimbrough did not follow up with Mr. Ng.

ii)   *Misstatements in December 18, 2015 press release about circumstances of the victim's identification of Mr. Moses-EL and the circumstances of Mr. Jackson's admissions.*

272.   On December 18, 2015, the Denver DA's Office issued a statement to the media trying to explain away the unreliability inherent in T.S.'s delayed, post-dream

identification of Mr. Moses-EL—a man known to her from the neighborhood—by

asserting (for the first time) that she had been in a coma:

> The victim knew Clarence Moses[-]El because he was her neighbor and she was able to recognize him during the attack.  Those who now argue that he was convicted based solely on a dream are either unaware of the complete facts or disregard them.  The victim was severely beaten, suffered multiple facial fractures, and was in a coma.  It took some time after the attack before the victim was able to give her statement.

273.    This press release misrepresented the facts.  There was no evidence that

T.S. was in a coma following the attack.  To the contrary, many witnesses at the first trial

testified that they had spoken with her after the attack, both at her sister's house and at

the hospital.

274.    The police officer who interviewed T.S. immediately after the attack

testified that she was able to speak to him and to provide details of what happened during

the sexual assault.

275.    According to the responding officer, T.S. told him:

-    that she had been sexually assaulted;

-    that she did not get a good look at the perpetrator because the lights in the room were out;

-    that she had been with "L.C. and Earl" that night;

-    that her attacker was a black male with waved-back hair or slicked back, wavy hair;

- that L.C. and Earl had such a hairstyle;

- that she had gone to a friend's house, come back home, come inside, undressed, gotten on the couch, and at that point someone had started sexually assaulting her;

- that the perpetrator had put something around her neck and dragged her upstairs; and

- that she was then sexually assaulted further.[16]

276.    Additionally, T.S.'s sister, Ms. Cousin, testified that she spoke with T.S. immediately after the attack and a couple of hours later when she visited her at the hospital.

277.    T.S. testified that after she was attacked, she went to her sister's house, explained what had happened to her, and was then taken to the hospital in an ambulance.

278.    T.S. herself testified that it was only after her dream in the hospital—during which she believed she had re-lived the attack—that she identified Mr. Moses-EL as her assailant.

279.    The District Attorney Office's factual misstatements were repeatedly reported by the media.

280.    The December 18, 2015, statement from the Denver DA's Office to the media also included the following assertions:

---

[16] Trial Tr. 04/05/88 pp. 106:13-113:21.

- What was presented as new evidence, resulting in the Court's decision to grant a new trial, was a confession that was not true and was retracted.

- The "new" evidence in this case was a "confession" by a mutual acquaintance of the victim and Moses[-]El, a man named L.C. Jackson.  When he made his "confession," his new claims were investigated, L.C. claimed that he had consensual sex with the victim. But his new details about having sex with her were implausible and not consistent with the brutal beating that resulted in the serious injuries she suffered.  L.C. Jackson is serving prison time for two convictions for sexual assault. In his statement to the District Attorney's investigator, he admitted he had lied and had made the confession up. He said he had been told by the Innocence Project that he couldn't be charged in the matter because of the statute of limitations, so he felt he could tell a few lies to help out Moses[-]El.

281.    This account is deliberately and significantly misleading because of the information it omitted.  Mr. Jackson gave sworn testimony before the district court on July 30, 2015, after having received legal advice from his own counsel.  Mr. Jackson testified that he had recanted to the prosecutor and the District Attorney Investigator because he felt intimidated.  He recounted how the District Attorney Investigator had

introduced himself by explaining that he had previously worked for the Denver Police Department and had arrested Mr. Jackson on a burglary case for which Mr. Jackson had served 8 years in prison.  Mr. Jackson testified before the Denver District Court at length that he had gone to the victim's home on the night she was attacked, that he had engaged in sexual intercourse with her, and that he had repeatedly hit her in her head.

282.    The Denver DA's Office's dissemination of Mr. Jackson's recantation without explaining that under oath, before the district court, and with the protection of his own counsel, he later retracted that recantation and reiterated his many inculpatory admissions left the general public with the false impression that Mr. Jackson had recanted at the evidentiary hearing before the district court.

283.    The District Attorney Office's misleading account of Mr. Jackson's recantation was repeated in various news articles and on television for weeks after the district court had vacated Mr. Moses-EL's convictions and ordered a new trial.[17]

---

[17] Keith Coffman, *Denver man jailed 28 years free on bond after rape conviction tossed*, Yahoo! News, Dec. 22, 2015, http://news.yahoo.com/denver-man-jailed-28-years-free-bond-rape-050216124.html; Rose Troup Buchanan, *Clarence Moses-EL: After 28 years inside, US man jailed for a rape he claims he never committed is finally freed*, Independent (UK), Dec. 23, 2015, http://www.independent.co.uk/news/world/ americas/clarence-moses-el-after-28-years-inside-us-man-jailed-for-a-rape-he-claims-he-never-committed-is-a6784216.html; Josiah Hesse, *Convicted of rape based on a dream, man relishes freedom after 28 years*, The Guardian, Dec. 24, 2015, http://www.theguardian.com/us-news/2015/dec/24/clarence-moses-el-free-denver-rape-case.

iii)   *Defendant Kimbrough made false statements to Richard Schnibbe on December 24, 2015.*

284.   On December 24, 2015, an individual named Richard Schnibbe sent an email to Defendant Morrissey heavily criticizing his mishandling of Mr. Moses-EL's case.

285.   Defendant Kimbrough wrote back to Mr. Schnibbe to transmit the District Attorney's public relations statement about this case. She further wrote, "This was not a conviction based on a dream, it was based on evidence presented during a 4-day trial including the defendant's own testimony."

286.   This was false. Mr. Moses-EL did not testify at his original trial.

iv)   *Defendant Kimbrough made false statements to editors of The Denver Post in response to their editorial urging the Denver DA's Office to drop the charges in this case.*

287.   On December 27, 2015, The Denver Post published an editorial titled: "DA should drop weak case against Clarence Moses-EL: Denver man served 28 years in prison on a flimsy case."

288.   Two days later, Ms. Kimbrough sent a multi-point rebuttal to the editors of The Denver Post embedded in the text of their editorial.  Her rebuttal included more false statements.

289.   The editorial stated that "Immediately after the 1987 attack in Denver's Five Points Neighborhood, the victim gave police three possible names: 'L.C., Earl and Darnell.'"  This information was correct.  At trial, T.S. was asked, "Did you tell the

policeman who did this to you?" and she replied, "When he asked me I said 'L.C., Earl, Darnell. I called three names."

290. Defendant Kimbrough responded misleadingly:

> The victim did not remember talking to the police immediately after the attack, and her sister testified at the trial that in naming these three men the victim was not identifying her attacker but was naming the men with whom she had been with [sic] that evening.

291. The Denver Post editorial further stated: "A couple of days later [the victim] told police the identity of Moses-EL came to her in a dream." Again, this information was correct. The victim testified at trial that she did not identify Mr. Moses-EL until a day or a day and a half after the attack. She testified that although she had initially identified L.C., Darnell, and Earl, she then had a dream in the hospital in which she relived the attack, and that is when she supposedly realized that her attacker was Mr. Moses-EL.

292. Defendant Kimbrough responded with additional false statements:

> Moses[-]El's identity did not come to her in a dream. She knew him as a neighbor, named "Bubbles." The victim was in a coma following the attack, and she re-lived the attack as nightmares during the time she was in that coma. When the police were finally allowed to talk with her, she identified her neighbor "Bubbles" as the attacker.

293. Again, the victim was not in a coma. And shortly after the attack, and more than a day before her nightmare, she recounted to a police officer the details of what had

happened to her, including that she had not gotten a good look at her assailant because the lights were out.

294. The Denver Post editorial further stated:

The case seemed stalled until 2006 when the name "L.C." reappeared.  L.C. Jackson was a neighbor of Moses-EL.  In 2006, authorities matched Jackson's DNA to a sexual assault that occurred in 1992, not far from where the 1987 rape occurred.

295. Defendant Kimbrough responded with more false statements:

The case seem [sic] stalled? The case went to trial, and after 4 days of testimony a jury of 12 Denver citizens who heard all of the evidence, including the testimony of the victim, Moses[-EL], and also L.C. Jackson, found him guilty.

L.C. Jackson was a neighbor and friend of the victim as well. It was  years later that he was convicted of two unrelated separate sexual assaults.

296. The jury that convicted Mr. Moses-EL did not hear him testify.  Nor did they hear "all of the evidence."  In 1988 when Mr. Moses-EL was tried, L.C. Jackson had not yet committed the two sexual assaults in 1992.  And of course, the jury at Mr. Moses-EL's trial in 1988 did not hear Mr. Jackson admit that on the night T.S. was attacked, he had followed her home in the middle of the night, had sexual intercourse with her, and repeatedly punched her in the face.  All the jury heard from Mr. Jackson was brief testimony about T.S.'s alcohol consumption at the party that evening.

> *v)*      *Defendant Kimbrough made false statements to Carol McKinley of Al-Jazeera America.*

297.    On December 29, 2015, Defendant Kimbrough forwarded to Carol McKinley, a reporter for Al Jazeera America, Defendant Kimbrough's responses to The Denver Post editorial calling for the charges to be dropped, containing all of these false and misleading statements.

**Q.    Defendant Benedetti Intentionally Delays Disclosing to Mr. Moses-EL's Attorneys a March 2015 Letter from Mr. Jackson to the Victim in the Case, Instead Prioritizing Serving as A Go-Between for A Convicted Rapist and One of His Victims.**

298.    On March 15, 2016, Mr. Jackson wrote a letter to T.S. asking her to speak with him.  Mr. Jackson sent this letter to T.S. care of the Denver DA's Office.  The Denver DA's Office received the letter on March 21, 2016.  In the letter, Mr. Jackson says he is sorry for what has happened and asks for T.S.'s contact information.

299.    The Denver DA's Office proceeded to deliver the letter to the victim. According to Defendant Benedetti, Mr. Jackson indicated to Defendant Benedetti at one of their visits with him that he would like to contact T.S.  The Denver DA's office then relayed his request to T.S.  She told the Denver DA's Office that she did not want Mr. Jackson to have her home address.

300.    Mr. Moses-EL's defense team was not made aware of this letter or the Denver DA's Office's delivery of it to T.S. until more than three weeks later, on April 12, 2016.  When confronted about this at a pretrial conference, on April 13, 2016, Defendant

Benedetti argued that she did not believe she had any obligation to even disclose this letter to the defense.

301.    The Court disagreed with Defendant Benedetti that she was not required to disclose this letter to Mr. Moses-EL's counsel[18] and reminded her of the prosecution's obligation to disclose such material as soon as practicable.

302.    On April 16, 2016, Mr. Jackson was able to contact T.S. through a phone provided by the Denver DA's Office at the behest of Defendant Benedetti.  Given that Mr. Jackson was incarcerated at the time, these calls were recorded.

303.    Mr. Jackson told T.S. that the DA's office had informed him that she was very mad at him.  Mr. Jackson told T.S. "that's why I asked for your information so that we could talk because I did not know what was being said or what was being done, so I was confused about them telling me that you were mad at me.  I was like I need to talk to her then and get her information, so I can put her on my phone list."

304.    Mr. Jackson and T.S. talked for more than 40 minutes and shared information regarding their recollections of the night of the crime and their conversations with both the prosecution and the defense.

305.    On May 22, 2016, Defendant Benedetti disclosed to Mr. Moses-EL's defense team a March 2016 letter from Mr. Jackson to T.S.  Defendant Benedetti did not

---

[18] Rule 16(I)(a)(1)(i) of the Colorado Rules of Criminal Procedure provides in part: "The prosecuting attorney shall make available to the defense the following material and information in their possession and control … Police, arrests and crime or offense reports, including statements of all witnesses."

provide requested documentation describing the Denver DA's Office's provision of a cell phone to T.S. for the purpose of accepting prison calls from Mr. Jackson.

**R.     Defendant Benedetti Intentionally Refuses to Disclose Reports Made to the Denver Police Department by Another Girl who had been Sexually Assaulted by Mr. Jackson.**

306.    Within a few weeks before a March 24, 2016 motions hearing in Mr. Moses-EL's case, another sexual assault victim of Mr. Jackson came forward to Mr. Moses-EL's defense counsel.  Mr. Jackson had sexually abused this victim, the young daughter of a woman he had been dating, in her own home when she was still in elementary school.  The sexual assaults involved digital penetration of the girl's vagina and oral sexual abuse.  When she was later a teenager in approximately the summer of 2003, this victim thought she saw Mr. Jackson, and she and her mother then reported Mr. Jackson's sexual abuse in person at the Denver Police Department.  No such reports or information have ever been disclosed to Mr. Moses-EL's defense team.  The defense moved for additional discovery of these reports as well as any other reports that Mr. Jackson had committed sexual assault, physical assault, burglary, or theft.

307.    At the March 24, 2016 motions hearing, the Denver DA's Office, consistent with its pattern of refusing to search for the truth in this case, revealed that it had not even asked the Denver Police Department to turn over the reports from this victim and her mother to the District Attorney's Office for prosecutorial review.

**S.     Defendants Benedetti and Carroll Manufacture Testimony to Create Probable Cause Against Mr. Moses-EL.**

*i)     Defendants Benedetti and Carroll Help Floyd Wesley Howard Remember T.S.'s Initial Identification of Mr. Moses-EL.*

308.    Floyd Wesley Howard was the boyfriend of T.S.'s sister, Ms. Cousin, at the time of the assault on T.S.  He was at Ms. Cousin's home, sitting on the outside porch, when T.S. came for help that night, beaten beyond recognition.  Soon after T.S. went into Ms. Cousin's home, Mr. Howard said he went looking around to see if he could see anyone.

309.    During the initial investigation of the attack on T.S. in 1987, Mr. Howard never claimed that T.S. made any identification at Ms. Cousin's home or before T.S. was hospitalized.

310.    The Denver DA's Office did not call Mr. Howard to testify at Mr. Moses-EL's first trial in 1988.

311.    During an interview with a defense investigator in 2007, Mr. Howard did not say anything about hearing T.S. identify the perpetrator of the attack.

312.    On May 20, 2015, more than 28 years after the attack on T.S., Defendant Carroll called Mr. Howard.  According to Defendant Carroll's report about the conversation, although Mr. Howard said he did not recall a lot about the incident, he believed that T.S. had said she was assaulted by "Bubba," who he knew to be the same person who was sent to prison for the assault.

313.    When Mr. Howard spoke with a defense investigator, he said his confidence in his memory of the identification was a score of 1 out of 10, with 1 being the least sure and 10 being the most sure.  Later during the interview, he told the defense investigator that he actually may have heard this thing about "Bubble" sometime later from neighborhood gossip, or from T.S. when she returned from the hospital, not on the night of the assault.

314.    On August 26, 2016, Defendants Benedetti and Carroll spoke with Mr. Howard again.  According to Defendant Carroll's report, Mr. Howard had previously been "racking his brain" to remember the night, but on the call with Defendants Benedetti and Carroll, he recalled that T.S. had called out the name of "Bubba" as the one who had assaulted her.

315.    After having conversations with Defendants Benedetti and Carroll, for the first time, Mr. Howard asserted that he had heard T.S. identify Mr. Moses-EL (a/k/a "Bubbles")—more than 28 years after the assault.

316.    Mr. Howard was called by the prosecution at Mr. Moses-EL's second trial to testify that T.S. had identified Mr. Moses-EL on the night of the assault.

317.    Mr. Howard testified that this identification was made to Ms. Cousin inside Ms. Cousin's home, shortly after the attack (before T.S. was taken to the hospital).

318.    The evolution of Mr. Howard's memory was discussed during his cross-examination at the second trial:

**Q.** Your memory a few months ago was different, right?

**A.** Yes.

**Q.** Your memory about this is stronger today, you would say, right?

**A.** Yes.  What I call talking to the universe.

**Q.** Okay.  And in talking to the universe, you've also been talking to the DA, right?

**A.** Right.

**Q.** And after talking to the universe and talking to the DA, your memory now is a 10 out of 10 on hearing [T.S.] say it was "Bubble"?

**A.** Yes.

**Q.** Whereas before it was a 1 out of 10, right?

**A.** Yes.[19]

319.    T.S. has never claimed that she identified Mr. Moses-EL to Ms. Cousin or Mr. Howard before she went to the hospital.  To the contrary, she has explained that she was, in her view, unable to identify Mr. Moses-EL until after her dream in the hospital.

320.    Ms. Cousin also did not testify that T.S. identified Mr. Moses-EL to either her or Mr. Howard before T.S. was taken to the hospital.

321.    Mr. Howard was the *only* witness to ever testify that T.S. had identified Mr. Moses-EL *before* she was taken to the hospital, given narcotics, and had her dream.

---

[19] Tr. 11/08/16, p. 128:8-22.

322.    As part of his being a witness in Mr. Moses-EL's second criminal trial, Mr.

Howard—who was living in Louisiana at the time—was provided a government-funded

trip back to Colorado for several days.   Specifically, the government paid for his travel

and hotel stay for a few nights.

323.    On information and belief, Mr. Howard's fabricated statements, secured by

Defendants Benedetti and Carroll pretrial, regarding T.S.'s identification of Mr.

Moses-EL provided a substantial basis supporting the decision of the Denver DA's Office

to continue to prosecute Mr. Moses-EL through a second criminal trial rather than

dropping the charges, and it caused Mr. Moses-EL's continued confinement.

> ii)    *Defendant Benedetti Requires Mr. Moses-EL's then-wife, Stephanie Burke,*
> *to Testify as a Witness for the Prosecution at Mr. Moses-EL's Retrial.*

324.    In her continued attempt to manufacture false evidence and avoid Mr.

Moses-EL's ultimate exoneration, Defendant Benedetti decided she would call Mr.

Moses-EL's then-wife, Stephanie Burke, to testify as a witness for the prosecution at the

retrial.

325.    Ms. Burke's attorneys asserted a testimonial privilege on her behalf.

326.    Despite the fact that Defendant Benedetti would not immunize Mr. Jackson

to allow him to testify without fear of additional criminal liability at Mr. Moses-EL's

evidentiary hearing or retrial, Defendant Benedetti did provide Ms. Burke with immunity

in order to force her to testify for the prosecution and against Ms. Burke's wishes.

327.     Unlike Mr. Jackson, whose testimony would exculpate Mr. Moses-EL, Ms. Burke was called to testify for the prosecution about an argument she had with Mr. Moses-EL the night T.S. was attacked.

328.     Defendant Benedetti also tried to use Ms. Burke's testimony to support Defendant Benedetti's fabricated theory that Ms. Burke had directed Mr. Moses-EL to commit crimes against T.S. on the night she was attacked.

329.     Neither Defendant Benedetti nor anyone else in the Denver DA's Office from 1987 through 2016 ever believed that Ms. Burke was truly involved in the crimes against T.S., because they never charged her for aiding and abetting or being an accessory to such crimes.

330.     Defendant Benedetti's differential approach to granting immunity to witnesses at Mr. Moses-EL's retrial demonstrates that she pursued a win-at-all-costs approach to Mr. Moses-EL's criminal case, rather than fulfilling her duty as a prosecutor to seek truth and justice.

**T.     Lack of Probable Cause for the Second Trial.**

331.     As late as February 2016, Defendant Benedetti and the Denver DA's Office were not sure whether they would re-try Mr. Moses-EL for the attack on T.S. and told his defense team as much.

332.     There was even less probable cause for the second prosecution of Mr. Moses-EL.

333.     There was still no physical evidence tying Mr. Moses-EL to the crime.

334.    T.S. had identified three other men multiple times before she ever identified Mr. Moses-EL.

335.    Mr. Moses-EL did not fit the initial physical description given by T.S.  She said that her assailant had hair that was slicked back with grease.  Mr. Moses-EL had a short buzz-cut, and his hair was not long enough to be slicked back.

336.    Also, it was very dark in T.S.'s home, she had extremely poor eyesight, she had taken her glasses off, and she was beaten in the head and face during the attack.  She initially told the responding officer she had not gotten a good look at the perpetrator.

337.    The only evidence tying Mr. Moses-EL to the crime was the dream-induced identification by T.S. more than a day after the attack, when she was in the hospital on prescribed narcotics.

338.    Due to this remarkable collection of circumstances demonstrating the unreliability of T.S.'s identification of Mr. Moses-EL, the defense disclosed to the Denver DA's Office and Defendant Benedetti the expert opinions of Daniel Reisberg, PhD, regarding the topic of memory and eyewitness identifications.

339.    Dr. Reisberg would later testify at the second trial to multiple factors that demonstrated the high degree of unreliability of T.S.'s identification of Mr. Moses-EL:

> [T]he circumstances here, viewed through the lens of science, say there are so many—call them red flags, call them danger signals, that as a scientist, I would never want to rely on this memory because the danger that it might be wrong is very, very high.[20]

---

[20] Tr. 11/08/16, pp. 113:22-114:3.

340.   Dr. Reisberg opined that, of the more than one thousand eyewitness identifications he has reviewed, T.S.'s identification of Mr. Moses-EL was one of the very worst for risk of false identification.

341.   T.S. had a deep dislike of Mr. Moses-EL's girlfriend which had resulted in physical and verbal altercations between them.

342.   T.S. even went so far as to add to her story during Mr. Moses-EL's preliminary hearing, claiming that she had seen Mr. Moses-EL's girlfriend, Ms. Burke, acting as a lookout for Mr. Moses-EL during the attack.  Likely realizing the untrustworthiness of T.S.'s evolving story, prosecutors never charged Ms. Burke for aiding and abetting or accessory.

343.   Defendants knew of the lack of physical evidence tying Mr. Moses-EL to the crime and the unreliability of T.S.'s identification of Mr. Moses-EL, but nonetheless caused him to be arrested and prosecuted.

344.   One of the men identified by the victim shortly after the attack had hair slicked back with grease and was gone from his girlfriend's home at the time of the attack, having implausibly claimed he was going to his grandmother's house in the middle of the early morning hours.  Furthermore, during the investigation for Mr. Moses-EL's second trial, Defendants possessed a significant amount of information about the similar crimes committed by Mr. Jackson.

345.   In addition to the sexual assaults he had been accused of before 1987, Defendants Morrissey, Benedetti, and Carroll knew that Mr. Jackson had also committed a very similar crime five years after the assault of T.S.  The similarities of the crimes are noted below:

| 1987 Assaults in the Case for Which Mr. Moses-EL Faced Retrial | L.C. Jackson's 1992 Assaults of Mother and Daughter |
| --- | --- |
| Victim lived two doors down in same low-income housing complex from L.C. Jackson's then-girlfriend, with whom he was staying. | Victims lived very close and in same low-incoming housing complex as L.C. Jackson's then-girlfriend, with whom he was staying. |
| L.C. Jackson was familiar with the floor plan of the victim's home. | L.C. Jackson was familiar with the floor plan of the victims' home. |
| L.C. Jackson was acquainted with the victim and knew that she was a woman living with young children. | L.C. Jackson was acquainted with the victims and knew the adult victim was a woman living with young children. |
| Perpetrator preyed upon the victim while her boyfriend was out-of-state. | L.C. Jackson preyed upon the victims while their husband/father was in jail. |
| Attack occurred in the early morning hours (around 2:30 a.m.). | Attack occurred in the early morning hours (around 2:30 a.m.). |
| Perpetrator unlawfully entered victim's home through a window. | L.C. Jackson unlawfully entered victims' home through a window. |
| Perpetrator raped the victim while her infant and toddler were in the same room. | L.C. Jackson raped the child victim while her two-year old sibling was in the same room. |
| Perpetrator sexually assaulted the victim in her upstairs bedroom. | L.C. Jackson sexually assaulted the victims in their upstairs bedrooms. |

| | |
|---|---|
| Perpetrator used a "do-rag" to cover the victim's face during the sexual assault. | L.C. Jackson used a pillowcase to cover the adult victim's face during the sexual assault. |
| Perpetrator sexually assaulted the victim in multiple manners (vaginal, anal, and digital). | L.C. Jackson sexually assaulted the adult victim in multiple manners (vaginal and oral). |
| Sexual assault begins vaginally. | Sexual assaults begin vaginally. |
| Perpetrator told victim to "shut up" when she expressed concern for her children. | L.C. Jackson told adult victim to "shut up" when she expressed concern for her children. |
| Perpetrator forced victim onto her bed. | L.C. Jackson pushed each victim onto their respective bed. |
| Perpetrator choked and squeezed victim's neck during the attack. | L.C. Jackson applied pressure to victims' necks during the attacks. |
| Perpetrator inflicted injuries to the victim's face, neck, and head. | L.C. Jackson inflicted injuries to the victims' head and neck areas. |
| Perpetrator forcefully relocated the victim from one floor of her house to another via a staircase. | L.C. Jackson forcefully relocated the adult victim from one floor of her house to another via a staircase. |
| All lights in the home were off during the sexual assault. | All lights in the home were off during the sexual assaults. |
| Perpetrator rifled through the victim's wallet and left contents scattered on the floor. | L.C. Jackson rifled through the contents of the adult victim's purse on the floor and stole her diamond wedding ring and other jewelry. |
| L.C. Jackson was drinking malt liquor the night the victim was attacked. | L.C. Jackson reeked of malt liquor during the rape of the adult victim. |

346.    In determining whether to force Mr. Moses-EL to go through a second trial, Defendants Morrissey, Benedetti, and Carroll also knew that Mr. Jackson had been charged with burglarizing his aunt's house, and that he was accused of having sexually assaulted another young girl in Denver.

347.    Defendants knew that Mr. Jackson was gone from his girlfriend Pamela Sanders's home during the time period when T.S. was being sexually assaulted and beaten two doors down from Ms. Sanders's home.

348.    Most importantly, Defendants were also aware that Mr. Jackson had admitted he had sexual intercourse with T.S. in her home and repeatedly hit her in the face at the time she said she was attacked.

349.    However, Defendants and the Denver DA's Office had significantly more to lose at this juncture.  If they were to concede that Mr. Moses-EL was innocent, then they would have been responsible for the nearly three decades he spent in prison—as well as for the crimes Mr. Jackson committed while he was allowed to remain at liberty.

350.    Recognizing this dynamic and the lack of probable cause to bring Mr. Moses-EL to trial in 2016, Defendant Benedetti tried to resolve the case by dangling the possibility of an extraordinarily lenient plea offer to Mr. Moses-EL.  She inquired of defense counsel whether Mr. Moses-EL would be interested in resolving the case with an *Alford* plea and a stipulation to a sentence of time served.

351.    An *Alford* plea is when a criminal defendant does not admit any wrongdoing but admits that the prosecution has enough evidence to convict him.  For a criminal defendant who has actually committed the crimes charged, a plea deal of an *Alford* plea with a stipulated sentence of time served is universally recognized as an extremely favorable deal, because it ensures that the defendant will never return to prison.

352.    Mr. Moses-EL, through counsel, rejected the prospect of any such offer, because he knew he was innocent.

353.    Unwilling to dismiss the charges despite the lack of probable cause, Defendants Morrissey and Benedetti decided to proceed to trial against Mr. Moses-EL for a second time for the assault of T.S.

354.    Defendant Brown-Dressel again served as a serology expert for the prosecution in Mr. Moses-EL's second criminal trial.  On information and belief, her continued, deliberate mischaracterizations substantially contributed to the Denver DA Office's decision to continue to prosecute Mr. Moses-EL through a second criminal trial, which resulted in him being under bond conditions for nearly a year.

**U.    Mr. Moses-EL's Acquittal.**

355.    Mr. Moses-EL's second trial began on November 7, 2016.

356.    The judge in Mr. Moses-EL's case ruled that the jury shouldn't hear evidence about events that took place after the original trial in 1988, including the destruction of the DNA evidence by the Denver Police Department or the other ways the

Defendants poorly investigated the case. The jury was also not allowed to be told Mr. Moses-EL already served 28 years in prison on this case. They were not told that Detective Huff had said in a sworn statement that he always had reservations about the case and suggested that the victim may have identified Mr. Moses-EL because of a personal vendetta against his girlfriend. And the jury was not allowed to hear about the similarities of Mr. Jackson's long list of known and suspected involvement in other sex assaults, burglaries, and physical assaults.

357.    Despite these extreme disadvantages, on November 14, 2016, a jury of eight women and four men found Mr. Moses-EL not guilty on all charges.

358.    Mr. Moses-EL walked out of Denver's Lindsey-Flanigan Courthouse a free man to a crowd of supporters:



359.    Illustrating Denver's deliberate disregard of the search for the truth in this case, Mr. Jackson has never been charged for the kidnapping of T.S.—despite the fact that Defendant Benedetti explicitly threatened such a charge against him. And on

information and belief, no other individual has even been investigated for the crimes committed against T.S. since the acquittal of Mr. Moses-EL.

**V.      Defendant City and County of Denver Has a Policy and Practice of Protecting its Convictions Regardless of the Truth, Utilizing Whatever Tactics Necessary to Cover-Up Wrongful Convictions.**

360.    Defendant City and County of Denver—through the actions of these Defendants, the Denver Police Department, and the Denver DA's Office—had a practice and custom using the full force of its authority to cover up wrongful convictions, as evidenced by many officials acting with deliberation, knowledge, and malice over the course of years to protect the reputation of themselves, their friends and colleagues, and the Denver DA's Office, regardless of truth or justice.

361.    Defendant City and County of Denver has a policy and practice of mishandling evidence—entrusted to the Denver Police Department and Denver DA's Office—which evidences the deliberate indifference of policymakers after repeated notice of the violative practices, and Defendant City and County of Denver followed that policy and practice here.

362.    As discussed *supra*, internal documents between the Denver DA's Office and the Denver Police Department reflect acknowledgement of the pattern of mishandling evidence prevalent in the Denver Police Department, and the lack of procedural safeguards that existed at the time Mr. Moses-EL's evidence was destroyed.

363.    As discussed *supra*, at least one Denver Police Department employee, Defendant Brown-Dressel, manipulated the numbers assigned to physical evidence under

her control, which resulted in well-known organizational chaos in even identifying the

correct evidence samples when they were needed.  This "old trick"—which would

undoubtedly have been impermissible had there been any policy or practice in place to

ensure the safe and responsible handling of evidence by the Denver Police Department—

resulted in difficulty even *locating* the biological evidence from the attack on T.S.

364.    Beyond the case against Mr. Moses-EL, the Denver Police Department has

a troubling pattern of mishandling physical evidence.  For example, the physical evidence

in the criminal case against Franke Eugenio Martinez, charged with possession and

mailing of explosives arising out of three mail bomb incidents in Denver, Colorado, was

improperly destroyed by the Denver Police Department.  Due to a "clerical error," on

September 16, 1974, all of the physical evidence from a bomb sent to a victim was

destroyed while Mr. Martinez's criminal case was still pending.[21]

365.    In a 1980 criminal case, a fingertip found at the scene of the homicide was

destroyed one month after the last test had been performed without consultation with of

either the court or counsel for the parties.[22]  On information and belief, this evidence was

destroyed by the Denver Police Department.

366.    In a different case in 1984, after conversing with an anonymous informant,

a Denver Police Department detective misplaced the envelope upon which he had written

---

[21] *See United States v. Martinez*, 744 F.2d 76, 79 (10th Cir. 1984) (finding no constitutional
violation because defendant did not show the evidence was material).
[22] *See People v. Morgan*, 606 P.2d 1296, 1298 (Colo. 1980).

her phone number, and the criminal defendant in the case at issue was precluded from using this information in his defense.[23]

367.    In 2002, the Denver Police Department destroyed evidence during an ongoing investigation before Richard Marshall's criminal trial for the 1975 murder of Native American activist Annie Mae Aquash.  This destruction of evidence was authorized by Jonathyn Priest of the Denver Police Department, who authorized the disposal without knowing what case the evidence belonged to and "never realiz[ing] another police unit held the items for a Federal agency."

368.    On information and belief, there are other examples of the Denver Police Department mishandling and destroying physical evidence related to the investigation and prosecution of criminal cases in Denver.

369.    When Mr. Moses-EL, a victim of this constitutionally deficient policy and practice of Defendant City and County of Denver, had the potential to receive a new trial based on the destruction of evidence in his case with the passage of Senate Bill 08-205, Defendants Morrissey and Whitley used their authority as prosecutors to deliberately deny Mr. Moses-EL the opportunity to vindicate his rights, acting pursuant to the practice of deliberately covering up wrongful convictions obtained by the Denver DA's Office.

---

[23] *See People v. Gann*, 724 P.2d 1318, 1322 (Colo. 1986) ("While undoubtedly the better police practice would have been to have taken steps to preserve the telephone number, we have no hesitation in concluding under the circumstances of this case that the *Trombetta* standard of constitutional materiality has not been met.").

370.    When L.C. Jackson later made admissions indicating his culpability in the crimes against T.S. for which Mr. Moses-EL had been wrongly prosecuted, convicted, and incarcerated, Defendants Benedetti and Carroll used the weight of their office to intimidate Mr. Jackson into writing a false, counter-factual recantation note (which he later retracted), acting pursuant to the practice of deliberately covering up wrongful convictions obtained by the Denver DA's Office.

371.    When the Denver District Court vacated Mr. Moses-EL's convictions for the attack against T.S. and granted him a new trial, Defendants Morrissey, Benedetti, Kimbrough, and Carroll utilized every tool at their disposal to try to ensure that Mr. Moses-EL would be wrongly convicted again, acting pursuant to the practice of covering up wrongful convictions obtained by the Denver DA's Office.  These actions include fabricating the testimony from Mr. Howard, fabricating the recantation of Mr. Jackson, failing to timely disclose to Mr. Moses-EL's attorneys discovery regarding Mr. Jackson's criminal history, and knowingly disseminating false information about Mr. Moses-EL's criminal case and the attack on T.S., all as discussed herein.

372.    Defendant City and County of Denver had a pattern or practice—through the constitutionally-violative actions of Defendants described herein—of covering up the wrongdoing of its officials.  This policy was effectuated through the practices of malicious prosecution, constitutionally-deficient evidence handling procedures, making

false statements to legislators about the facts of the case against Mr. Moses-EL, and fabricating evidence prior to Mr. Moses-EL's second criminal trial.

373.    The actions of Defendants described herein and done pursuant to Defendant City and County of Denver's pattern and practice of covering up wrongful convictions were done in a conscious, coordinated way to ensure that Mr. Moses-EL would continue to be imprisoned for crimes Defendants knew he had not committed.

374.    Based primarily on the fact that he cannot produce DNA testing results to establish his innocence, Mr. Moses-EL currently faces opposition in state court from the Colorado Attorney General's Office to his claim for statutory compensation for his wrongful conviction.

**W.    Mr. Moses-EL's Personal, Psychological, and Familial Injuries.**

375.    Mr. Moses-EL spent more than 28 years in prison for crimes he did not commit.

376.    He spent another year under conditions of bond awaiting another traumatic trial experience where his liberty would again be on the line, and where he knew from his experience in the 1988 trial that his innocence could not guarantee protection from wrongful conviction brought about by Defendant Denver's custom of avoiding a search for the truth in criminal investigations and prosecutions.

377.    Imprisoned at the age of 32 and released at age 60, he was deprived of almost his entire adult life.  He must now attempt to make a life for himself outside of

prison without the benefit of 28 years of life experiences, which normally equip adults for that task.

378.    While he was imprisoned, Mr. Moses-EL missed the lives, and deaths, of his brothers, Robert and James.  His youngest sister Joane and his oldest sister Maggie lived their last days and died while Mr. Moses-EL was in prison.  Mr. Moses-EL's father also died during this time.  And Mr. Moses-EL's best friend, most avid supporter, and mother, Elouise, passed away while Mr. Moses-EL was locked in a prison cell—not living to know that her son would one day walk out of prison and have his innocence vindicated.

379.    Mr. Moses-EL, who was first arrested when his daughter Tyice was four years old and his son Anthony was three, was imprisoned for his children's first days of school, their first dances, their first jobs, and other important personal milestones and celebrations.  Mr. Moses-EL was forced to miss the births and infancies of his twelve grandchildren.

380.    Additionally, the emotional pain and suffering caused by losing 28 years in the prime of life has been substantial.  During his wrongful incarceration, Mr. Moses-EL was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.

381.   He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

382.   As a result of the foregoing, Mr. Moses-EL has suffered tremendous damage, including physical harm and injury, severe emotional distress and anguish, and pecuniary damages, all proximately caused by Defendants' misconduct.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 — Malicious Prosecution**
**Violation of the Fourth & Fourteenth Amendments**
**(against Defendants Morrissey, Benedetti, Kimbrough, Carroll,**
**Brown-Dressel, and Huff)**

383.   Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Amended Complaint as if set forth fully herein.

384.   Mr. Moses-EL brings this claim against Defendants Morrissey, Benedetti, Kimbrough, Carroll, Brown-Dressel, and Huff.

385.   Defendants were acting under the color of state law at all times relevant to this Complaint.

386.   Probable cause did not exist to charge Mr. Moses-EL in either his 1988 or 2016 criminal prosecutions for the sexual assault of T.S.

387.   Twenty-eight years of litigation and advocacy resulted in a favorable termination of Mr. Moses-EL's criminal case when he was acquitted of all charges in 2016.

388.   By spreading false information to state legislators in 2008 about the strength of Mr. Moses-EL's case and thereby entrenching his office in the subsequent prosecution of Mr. Moses-EL despite the lack of probable cause, Defendant Morrissey, acting under his authority as District Attorney, caused Mr. Moses-EL to be subject to a continued illegitimate prosecution, forced him to go through a second trial, and deprived him of due process of law in violation of the Fourteenth Amendment to the United States Constitution.  In his legislative advocacy and correspondence with legislators, Defendant Morrissey was not acting in his prosecutorial capacity.

389.   Defendant Morrissey caused Mr. Moses-EL's prosecution with motives other than a desire to bring an offender to justice—specifically, based on a political motive—as shown from the want of probable cause, and the knowing and intentional, or with reckless disregard for the truth, spreading of false information concerning Mr. Moses-EL's case and guilt.

390.   By intimidating a serial rapist who was initially identified by the victim as her assailant and ultimately confessed to the crime of his own volition into a flimsy recantation, and by manufacturing witness testimony to attempt to create probable cause, Defendants Benedetti and Carroll caused Mr. Moses-EL to be subject to a second

illegitimate prosecution and deprived him of due process of law in violation of the

Fourteenth Amendment to the United States Constitution.  These unlawful acts occurred

during the Denver DA's investigation into Mr. Moses-EL, and Defendant Benedetti was

not acting in her prosecutorial capacity.

391.  Defendants Benedetti and Carroll caused Mr. Moses-EL's prosecution with

motives other than a desire to bring an offender to justice as shown from the want of

probable cause, and by their manufacturing of evidence knowingly and intentionally, or

with reckless disregard for the truth.

392.  By repeatedly disseminating to the media and the public false information

about the strength of the case against Mr. Moses-EL, even when she was confronted with

the falsity of her claims, and thereby further entrenching the Denver DA's Office in its

prosecution of Mr. Moses-EL in 2016 despite the lack of probable cause, Defendant

Kimbrough caused Mr. Moses-EL to be subject to a second illegitimate prosecution and

deprived him of due process of law in violation of the Fourteenth Amendment to the

United States Constitution.

393.  By using her position as an expert in forensic serology to: (i) knowingly

withhold information from and mislead prosecutors, Mr. Moses-EL's defense attorneys,

and the jury about the proper interpretation and analysis of the results of the serology

testing conducted on the biological evidence in Mr. Moses-EL's case; and (ii)

deliberately refusing to seek DNA testing of the evidence collected from T.S. before the

1988 trial despite her knowledge of its availability and potential to conclusively determine whether Mr. Moses-EL was the true perpetrator, Defendant Brown-Dressel caused Mr. Moses-EL to be subject to his 1987-88 prosecution and trial and deprived him of due process of law in violation of the Fourteenth Amendment to the United States Constitution.

394.    By encouraging the first prosecution of Mr. Moses-EL in 1988 despite the fact that he personally knew of the blatant unreliability of the only evidence against Mr. Moses-EL—the late, dream-induced identification by a victim with ulterior motives— and by failing to investigate an obvious alternate suspect who had a history of sexual assault, Defendant Huff caused Mr. Moses-EL to be subject to his 1987-88 prosecution and trial, and deprived him of due process of law in violation of the Fourteenth Amendment to the United States Constitution.

395.    As a result of Defendants' unlawful conduct, Mr. Moses-EL was maliciously prosecuted and tried twice for crimes he did not commit and was imprisoned for 28 years based on the first conviction.  Mr. Moses-EL has suffered emotional distress, psychological injury, and destruction of family ties based on the malicious prosecution of the Defendants.  He continues to suffer physical and psychological harm resulting from the years of Defendants' efforts to wrongfully prosecute and incarcerate crimes he did not commit.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Destruction of Exculpatory Evidence**
**Violation of the Fourteenth Amendment**
**(against Defendants Whitley and Huff)**

396.     Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

397.     Mr. Moses-EL brings this claim against Defendants Whitley and Huff.

398.     Defendants Whitley and Huff were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

399.     Defendants Whitley and Huff, acting within scope of their employment, recklessly, knowingly, intentionally, willfully, and wantonly destroyed and failed to register, store, test, maintain, and control exculpatory evidence that they knew would have vitiated probable cause to arrest, prosecute, and imprison Mr. Moses-EL.

400.     While Mr. Moses-EL was incarcerated (and/or while any conviction against him remained on file), Defendants Whitley and Huff had a constitutional obligation to register, store, preserve, maintain, and test exculpatory evidence relating to the crimes of which Mr. Moses-EL was wrongfully charged and convicted.

401.     The exculpatory value of the evidence was apparent to Defendants Whitley and Huff.  In the alternative, the evidence was potentially exculpatory, and these Defendants knew that.

402.     Nonetheless, these three Defendants acted in bad faith in destroying the rape kit and clothing collected from T.S. and her home.

97

403.    If the aforementioned evidence had been properly registered, stored, preserved, maintained, and tested by Defendants Whitley and Huff, Mr. Moses-EL would not have been wrongfully incarcerated and then re-tried for the same crimes.

404.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Moses-EL's constitutional rights.

405.    The misconduct described in this Count was undertaken by employees and agents of the City of Denver, including but not limited to the Defendants Whitley and Huff pursuant to the policies and practices of the City of Denver Police Department more fully described above.  This includes but is not limited to destroying evidence to prevent Mr. Moses-EL from proving his innocence.

406.    As a direct and proximate result of this misconduct, Mr. Moses-EL's constitutional rights were violated, and he suffered physical harm and injury, severe emotional distress and anguish, and pecuniary damages, as more fully alleged above.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Manufacturing False Inculpatory Evidence
### Violation of the Fourteenth Amendment
### (against Defendants Benedetti and Carroll)

407.    Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

408.    Mr. Moses-EL brings this claim against Defendants Benedetti and Carroll.

409.    Defendants were acting under the color of state law at all times relevant to this Complaint.

410.    Defendants Benedetti and Carroll manufactured false inculpatory evidence against Mr. Moses-EL by recklessly, knowingly, intentionally, willfully, and wantonly intimidating L.C. Jackson into giving a false recantation of his true admissions of his involvement in the crimes against T.S.

411.    Defendants Benedetti and Carroll did this by threatening Mr. Jackson that they could file further charges against him and letting him know exactly what they wanted him to provide—a recantation of his previous admissions of involvement in the crimes for which Mr. Moses-EL sat in prison.

412.    In an attempt to try to prove Mr. Moses-EL guilty at his second trial, Defendants recklessly, willfully, and wantonly persuaded Mr. Howard—the boyfriend of T.S.'s sister, Ms. Cousin, at the time of the assault—to remember for the first time, 28 years after the incident, that immediately after the attack, T.S. had supposedly said to Ms. Cousin inside Ms. Cousin's home that the person who had assaulted her was "Bubba" (Mr. Moses-EL).

413.    Although when speaking to a defense investigator, Mr. Howard admitted that his memory about this matter was unreliable and weak (a 1 on a scale of 1 to 10) and that he may have heard something about "Bubbles" from neighborhood gossip instead of from T.S., after speaking again with Defendants Benedetti and Carroll, Mr. Howard

claimed to confidently recall (28 years after the fact) that T.S. had identified Mr.

Moses-EL to Ms. Cousin immediately after the attack at Ms. Cousin's home.

414. This memory of Mr. Howard's was inconsistent with—and contradicted

by—the accounts of both T.S. and Ms. Cousin.

415. Defendants Benedetti and Carroll knowingly and intentionally used Mr.

Howard's unreliable testimony in order to prosecute and attempt to wrongfully convict

Mr. Moses-EL for the second time.

416. In a further attempt to ensure Mr. Moses-EL would be found guilty again,

Defendant Benedetti willfully and wantonly gave Ms. Burke, then Mr. Moses-EL's wife,

immunity for her testimony for the sole purpose of fabricating false inculpatory evidence

that Ms. Burke had supposedly directed Mr. Moses-EL to commit crimes against T.S. on

the night she was attacked.

417. The acts or omissions of Defendants Benedetti and Carroll were the legal

and proximate cause of Mr. Moses-EL's unconstitutional arrest, prosecution, conviction,

and confinement, causing his injuries alleged herein.

418. As a direct and proximate result of this misconduct, Mr. Moses-EL's

constitutional rights were violated, and he suffered physical harm and injury, severe

emotional distress and anguish, and pecuniary damages, as more fully alleged above.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Deliberate Disregard of the Search for the Truth and Unconstitutional Tactics to Cover Up and Secure Prosecutions Violation of the Fourteenth Amendment (against the City and County of Denver)

419.   Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

420.   Mr. Moses-EL brings this claim against Defendant City and County of Denver.

421.   The Denver Police Department is a subdivision of Defendant City and County of Denver.

422.   The Denver DA's Office is an agency of Defendant City and County of Denver.

423.   Municipalities and their subdivisions may be held liable to an individual if they enforce a policy or custom that causes the deprivation of individual's constitutional rights.

424.   Municipal liability may be based upon:

    i.   A formal promulgated policy;

    ii.   A well settled custom or practice;

    iii.   A final decision by a municipal policymaker; or

    iv.   Deliberately indifferent training or supervision.

425.   Defendant the City and County of Denver, by and through its final policymakers, maintained the following unconstitutional custom, decision, policy, and/or

101

indifferent employee training or supervision practices that allowed for various

constitutional violations:

    i.    Defendant City and County of Denver had a pattern or practice—

through the practices of malicious prosecution, constitutionally-

deficient evidence handling procedures, making false statements to

legislators, and the fabrication of evidence prior to Mr. Moses-EL's

second criminal trial—of pursuing malicious prosecutions to cover up

wrongful convictions and the wrongdoing of its officials.

    ii.    Defendant City and County of Denver personnel, through well-settled

practices and a lack of formal policies, systemically and recklessly

mishandled, destroyed, or lost evidence, to further their personal goals

of obtaining and sustaining convictions;

    iii.    Defendant City and County of Denver personnel, through well-settled

practices and a lack of formal policies, systematically and recklessly

failed to communicate with the Denver DA's Office to ensure the

proper preservation of evidence under their custody and control;

    iv.    The Denver Police Department exhibited deliberately indifferent

training and/or supervision of personnel in its Forensic Laboratory by

failing to establish any standard operating procedures or formal

scientific analytical methods for serological procedures undertaken at the time relevant to this Complaint;

v.   The Denver Police Department—through a final, fateful decision by Defendant Huff, acting at that moment as a municipal policymaker—caused the biological evidence in Mr. Moses-EL's case to be completely destroyed.

426.   Defendant City and County of Denver's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices were: (i) deliberately or recklessly indifferent to the repeated destruction and/or loss of material criminal evidence; (ii) deliberately or recklessly indifferent to a criminal defendant's constitutional rights; and (iii) deliberately or recklessly indifferent to whether innocent people were being wrongfully convicted of crimes they had not committed.

427.   The City and County of Denver's municipality liability here is premised upon among other things, its failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

428.   As a direct and proximate result of the City and County of Denver's unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices, Mr. Moses-EL was wrongfully convicted and imprisoned for more than 28 years.  During these events, Mr. Moses-EL endured substantial physical, emotional, and pecuniary injuries.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Conspiracy to Violate Mr. Moses-EL's Civil Rights**
**Violation of the Fourth and Fourteenth Amendments**
**(against Defendants Morrissey, Benedetti, Kimbrough, and Carroll)**

429.    Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

430.    Mr. Moses-EL brings this claim against Defendants Morrissey, Benedetti, Kimbrough, and Carroll.

431.    Defendants were acting under the color of state law at all times relevant to this Complaint.

432.    Defendants Morrissey, Benedetti, Kimbrough, and Carroll recklessly, knowingly, intentionally, willfully, and wantonly conspired with one another, and others, to deprive Mr. Moses-EL of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  By prosecuting and aiding the prosecution of Mr. Moses-EL despite knowing that the great weight of evidence supported his innocence, these Defendants attempted to cover up the Denver Police Department's and Denver DA's Office's botched investigation and intentional destruction of exculpatory evidence, which had resulted in the multi-decade imprisonment of an innocent man while allowing a serial rapist to remain at liberty to continue to victimize Denver women and girls.

433.    The Defendants reached an agreement amongst themselves to use their positions of authority and influence to spread lies about the 1987 crime and the strength of the evidence against Mr. Moses-EL, and to prosecute him through any means possible

to cover up the egregious injustice that had been perpetrated against Mr. Moses-EL, and to thereby deprive him of his constitutional rights, as illustrated in the systematic and orchestrated deprivations spelled out in the various paragraphs of this Complaint.

434.    Each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

435.    As a direct and proximate result of the illicit agreement referenced above, Mr. Moses-EL's constitutional rights were violated, and he suffered physical harm and injury, severe emotional distress and anguish, and pecuniary damages, as more fully alleged above.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Fundamental Unfairness of
### the Prosecutions of Mr. Moses-EL
### Violation of the Fourteenth Amendment-Procedural and Substantive Due Process
### (against Defendants Morrissey, Benedetti, Whitley, Kimbrough, Carroll, Brown-Dressel, and Huff)

436.    Mr. Moses-EL incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

437.    Mr. Moses-EL brings this claim against Defendants Morrissey, Benedetti, Whitley, Kimbrough, Carroll, Brown-Dressel, and Huff.

438.    Defendants were acting under the color of state law at all times relevant to this Complaint.

439.    Mr. Moses-EL has a protected liberty interest in freedom from prosecution, bond conditions, and incarceration by the State, except upon due process that complies with all constitutional requirements.

440.    By engaging in one or more of the following acts, each Defendant, as detailed above and acting recklessly, knowingly, intentionally, willfully, and wantonly, played a personal and essential role in ensuring that Mr. Moses-EL's prosecution and criminal trials lacked fundamental fairness to a degree that shocks the universal sense of justice: (i) destroying exculpatory DNA evidence court-ordered to be preserved and tested in order to conclusively assess the innocence of Mr. Moses-EL, thereby extending his imprisonment for crimes he did not commit and depriving him of the exculpatory evidence in his second trial; (ii) systematically withholding exculpatory evidence from Mr. Moses-EL and his defense counsel regarding true perpetrator Mr. Jackson; (iii) systematically manufacturing inculpatory evidence that was designed to promulgate the prosecution and continued confinement of Mr. Moses-EL, and using this evidence against him by presenting such evidence to prosecutors, judicial officers, members of the public, jurors, and Mr. Moses-EL and his defense counsel; (iv) refusing to investigate alternative and more viable suspects; (v) before and during Mr. Moses-EL's first trial—and before and during subsequent legal proceedings and prosecutions—misleading prosecutors about the conclusions that could have been drawn by serological testing and refusing to seek DNA testing; (vi) attempting, and taking affirmative steps, to deny Mr. Moses-EL access

to potential judicial remedies based on the destruction of exculpatory DNA evidence;
(vii) conspiring to fabricate probable cause to prosecute Mr. Moses-EL and to continue to
confine Mr. Moses-EL, despite the great weight of evidence pointing to his innocence;
(viii) failing to train and supervise to prevent the above constitutional violations; and (ix)
failing to establish policies, customs, and/or practices to prevent the above constitutional
violations.

441.    Although Mr. Moses-EL has since been acquitted, the reckless, knowing,
intentional, willful, and wanton actions by Defendants described herein caused Mr.
Moses-EL to be unconstitutionally incarcerated and re-prosecuted.  These actions were
egregious and were carried out in a manner that shocks the conscience, thus depriving
Mr. Moses-EL of his constitutional rights.

442.    As described above, Defendant Morrissey, as Denver District Attorney and
supervisor of Defendants Benedetti, Kimbrough, and Carroll, recklessly, knowingly,
intentionally, willfully, and wantonly participated in making Mr. Moses-EL's second
criminal trial unfair by disseminating false information and entrenching his office in the
political prosecution of Mr. Moses-EL.  Defendant Morrissey knew of, condoned, and/or
approved the wrongful acts of Defendants Benedetti, Kimbrough, and Carroll described
herein, with the intent and understanding to bring about Mr. Moses-EL's unconstitutional
continued confinement and prosecution.

443.    As a direct and proximate result of the actions referenced above, Mr. Moses-EL's rights were violated, and he suffered physical harm and injury, severe emotional distress and anguish, and pecuniary damages, as is more fully alleged above.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Fundamental Unfairness of
### Clarence Moses-EL's Criminal Trial
### Violation of the Fourteenth Amendment-Procedural and Substantive Due Process
### (against Defendant Morrissey)

444.    Mr. Moses-EL brings this claim against Defendant Morrissey.

445.    The acts of Defendants Benedetti, Kimbrough, and Carroll were committed under their authority as employees of the Denver DA's Office vested under the laws of the State of Colorado; these acts were, therefore, committed under the color of state law.

446.    Defendant Morrissey knew or should have known of the need for additional screening, training, supervising, and disciplining of employees of the Denver DA's Office to ensure that such employees would: (i) refrain from ignoring a criminal defendant's innocence; (ii) refrain from disseminating false information; (iii) exercise care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but an unreliable identification; and (iv) refrain from filing and pursuing charges in bad faith without probable cause.

447.    Through intentional and deliberate indifference and reckless disregard of basic civil rights, Defendant Morrissey failed to provide adequate screening, training, supervision, and discipline of employees of the Denver DA's Office with respect to: (i)

conducting a proper investigation; (ii) disseminating truthful information; (iii) exercising care and thoroughness in the investigation and prosecution of a case of a crime involving no other evidence but an unreliable identification; and (iv) refraining from filing and pursuing charges in bad faith without probable cause.

448.    At all relevant times, the Denver DA's Office, personally and/or through its agents and employees, had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to the Denver DA's Office's performance of its duties. Defendant Morrissey (and/or his authorized agents) was a City and State "policymaker"; he acted, however, with a reckless disregard to the constitutional rights of Mr. Moses-EL.

449.    But for Defendant Morrissey's deliberate indifference to the inadequate screening, training, supervision, and discipline of employees of the Denver DA's Office, Mr. Moses-EL would not have continued to be wrongfully convicted and deprived of his liberty in violation of his constitutional rights.

450.    The foregoing violations of Mr. Moses-EL's constitutional rights, his conviction, his sentence, his incarceration, and his resulting and continuing injuries were directly and proximately caused by the deliberate indifference to Mr. Moses-EL's constitutional rights by Defendant Morrissey and his subordinates.

451.    As a direct and proximate result of Defendant Morrissey's actions referenced above, Mr. Moses-EL suffered physical harm and injury, severe emotional distress and anguish, and pecuniary damages, as is more fully alleged above.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Mr. Moses-EL respectively requests that this Court enter judgment in his favor and against the Defendants, and award him all relief as allowed by law and equity, including, but limited to, the following:

a)    A declaration that Defendants violated the federal constitutional rights of Mr. Moses-EL;

b)    Actual economic damages as established at trial;

c)    Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d)    Punitive damages for all claims allowed by law in amount to be determined at trial;

e)    Nominal damages;

f)    Pre-judgment and post-judgment interest at the highest lawful rate;

g)    Attorney's fees and the costs associated with this action as allowed by law; and

h)       Any further relief that this Court deems just and proper, and any other relief

as allowed by law.

MR. MOSES-EL REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 26th day of March 2018.

JOHNSON & KLEIN, PLLC

s/Gail K. Johnson
**_Gail K. Johnson_**
Eric K. Klein
Aurora L. Randolph
1470 Walnut Street, Suite 101
Boulder, CO  80302
(303) 444-1885
(866) 340-8286 (fax)
gjohnson@johnsonklein.com
eklein@johnsonklein.com
arandolph@johnsonklen.com

ATTORNEYS FOR PLAINTIFF
CLARENCE MOSES-EL

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March 2018, I electronically filed the

foregoing AMENDED COMPLAINT AND JURY DEMAND with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the

following:

Michele A. Horn
Melanie B. Lewis
Denver City Attorney's Office
Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
michele.horn@denvergov.org
melanie.lewis@denvergov.org
*Attorneys for Defendants City and County of Denver,*
*and Kathren Brown-Dressel*

Andrew Ringel
Keith Goman
Matthew Hegarty
Hall & Evans, LLC
1001 Seventeenth St., Suite 300
Denver, CO 80202
ringela@hallevans.com
gomank@hallevans.com
hegartym@hallevans.com
*Attorneys for Defendants Mitchell R. Morrissey,*
*Bonnie Benedetti, Robin Whitley,*
*Lynn Kimbrough, and Jeff Carrol*

<u>s/ Aurora Randolph</u>
***Aurora Randolph***