IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
SENIOR JUDGE MARCIA S. KRIEGER

Civil Action No. 17-cv-03018-MSK-NRN

CLARENCE MOSES-EL,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
MITCHELL R. MORRISSEY,
BONNIE BENEDETTI,
ROBIN WHITLEY,
LYNN KIMBROUGH,
JEFF CARROLL,
DR. KATHRYN BROWN-DRESSEL, and
ESTATE OF JAMES HUFF,

      Defendants.

_____

## OPINION AND ORDER GRANTING MOTIONS TO DISMISS
_____

**THIS MATTER** comes before the Court pursuant to: 1) the Motion to Dismiss brought by Defendants Morrissey, Benedetti, Whitley, and Kimbrough (collectively, "the DA Defendants") **(# 57)**, Mr. Moses-El's response **(# 80)** the DA Defendants' reply **(# 88)**; 2) the Motion to Dismiss brought by Defendants City and County of Denver ("Denver") and Brown-Dressel ("Dr. Brown") **(# 62)**, Mr. Moses-El's response **(# 81)**, and Dr. Brown's reply **(# 87)**; and 3) the Motion to Dismiss brought by Defendant Estate of James Huff (hereafter "Mr. Huff" or "the Estate," as applicable) **(# 86)**, Mr. Moses-El's response **(# 95)**, and the Estate's reply **(#103)**.

## <u>ALLEGED FACTS</u>

The operative pleading is Mr. Moses-El's Amended Complaint **(# 47)**, a formidable document - 113 pages and 451 numbered paragraphs. It tells a tragic story, but because much of the story is not pertinent to the issues presented, the Court is required to strip away rhetorical flourishes, conclusory statements and threadbare recitals in evaluation of the pleading under Fed. R. Civ. P. 12(b)(6). *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). Having done so, the Court finds that the remaining pertinent, well-pled facts follow.

On the evening of August 15, 1987, an individual identified as T.S. was assaulted and violently raped in her apartment. ¶ 45. In her initial contacts with police, she identified her attacker as one of three possible men, L.C. Jackson, (hereafter, "Mr. Jackson"), Earl Jackson, or a man named Darnell. ¶ 54. A few days later, T.S. had a dream in which she re-lived the attack. She awoke from that dream convinced that it was Mr. Moses-El who attacked her. ¶ 56. T.S. then contacted Denver police and formally accused Mr. Moses-El.

Mr. Huff, then a detective on the Denver police force, investigated the attack on T.S. He was skeptical of the accuracy of T.S.'s identification of Mr. Moses-El, and advised the Denver District Attorney's office of that skepticism. ¶ 64. Nevertheless, Denver police chose to focus on T.S.'s accusations, and did not investigate L.C. Jackson or the other individuals initially identified by T.S. ¶ 67. On August 18, 1987, Mr. Huff and other members of the Denver police arrested Mr. Moses-El for the attack. ¶ 89.

On or about October 7, 1987, Dr. Brown reported the results of blood and semen testing taken from the rape kit of T.S. revealed the presence of an O blood type, and that Mr. Moses-El's blood type was B. Dr. Brown reported this information to Mr. Huff, but opined that "the tests are not conclusive either way." ¶ 97. The Amended Complaint alleges that, because of the

sensitivity of the test she used and biological characteristics of Mr. Moses-El, Dr. Brown should have recognized that the blood tests were not inconclusive, but instead exculpated Mr. Moses-El. ¶ 107. Dr. Brown testified at Mr. Moses-El's trial in 1988 that the rape kit revealed the presence of an O blood type and that Mr. Moses-El had a B blood type, but Dr. Brown stood by her conclusion that the testing was inconclusive because, she believed, it was possible that the type-O blood could have come from T.S. instead. ¶ 113. Mr. Moses-El contends that, with the technology available in 1988, Dr. Brown could have readily concluded that it was highly unlikely (*i.e.* only a 7% chance) that he was the attacker. ¶ 115. Therefore, Mr. Moses-El alleges that Dr. Brown's "mischaracterization" of the blood evidence "was malicious." ¶ 118. He also contends that Dr. Brown should have addressed the inconclusiveness of the blood testing by requesting authorization to conduct a DNA test, but she did not. ¶ 122.

On April 8, 1988, Mr. Moses-El was convicted at trial and on March 17, 1989, he was sentenced to 48 years in prison. ¶ 132. Mr. Moses-El commenced a series of collateral attacks on his conviction, and in 1993, the Colorado Court of Appeals inquired whether the blood and semen samples taken from T.S. were still available for DNA testing. ¶ 145. Mr. Moses-El's counsel and the Denver DA's office reached an agreement that the samples would be preserved by the Denver Police Department. ¶ 147. At the request of Mr. Whitley, a Denver DA overseeing Mr. Moses-El's case in July 1995, an employee of the Denver Police Department marked samples relating to Mr. Moses-El's case with the note "DO NOT DESTROY" and logged the existence of the sample in the Police Department's computer. ¶ 153. Nevertheless, in October 1995, Mr. Huff approved a request by police staff to destroy a collection of evidence, including the samples in question, overlooking the notation that the samples should be preserved. ¶ 159. The samples were destroyed in December 1995, right around the time when Mr. Moses-

El and Mr. Whitley were preparing to have the samples submitted to an outside lab for further testing. ¶ 171, 175.

In 2007, a Denver Post investigation highlighted Mr. Moses-El's case in conjunction with a story about the destruction of DNA samples by the Denver Police Department. ¶ 213. Members of Colorado's legislature proposed legislation to address situations like Mr. Moses-El's where potentially exculpatory evidence was destroyed. ¶ 220. Mr. Morrissey, Denver's District Attorney, and Mr. Whitley both lobbied against the bill. ¶ 225, 228. The Amended Complaint contends that Mr. Morrissey made false statements to legislators and the public regarding certain aspects of Mr. Moses-El's case, such as that T.S. had not previously identified others as her attackers or that she had delayed in identifying Mr. Moses-El. ¶ 227. The Amended Complaint does not clearly assert, but the Court assumes the proposed legislation did not pass.

In April 2012, Mr. Jackson sent a letter to Mr. Moses-El, confessing that he had "a lot on [his] heart" and inviting Mr. Moses-El to having investigators contact him. ¶ 232. Mr. Jackson subsequently told investigators that he had been T.S.'s attacker.[1] ¶ 233. Mr. Moses-El moved to vacate his conviction based upon Mr. Jackson's confession, but Ms. Benedetti, now the D.A. handling Mr. Moses-El's case, opposed the motion, believing Mr. Jackson's confession to be false and opportunistic. ¶ 237. The state court granted Mr. Moses-El an evidentiary hearing on his motion in September 2014. ¶ 236. Ms. Benedetti suggested that the state court appoint

---

[1]    A significant portion of Mr. Moses-El's allegations focus on Mr. Jackson's substantial criminal history, both actual and alleged, only some of which predated the attack on T.S. and original prosecution of Mr. Moses-El. It is not necessary to dwell on the particulars of any specific incident involving Mr. Jackson, except perhaps to observe that in 1992, an unsolved sexual assault on a mother and daughter bore some similarities to the attack on T.S. In 2007, a DNA test on the evidence from that 1992 assault matched DNA given by Mr. Jackson incident to a prior conviction. Mr. Jackson was prosecuted and convicted of the 1992 assault about the same time that the Denver Post was featuring Mr. Moses-El's situation in its reporting as set forth above.

counsel for Mr. Jackson, as his testimony might implicate his Fifth Amendment rights; Mr. Moses-El contends that the likelihood that Denver could prosecute Mr. Jackson for any crime relating to T.S. at that point in time was "at best, a stretch." ¶ 239, 240. Mr. Moses-El contends that Ms. Benedetti was hoping that, with the assistance of counsel, Mr. Jackson might elect not to testify in favor of Mr. Moses-El. ¶ 241.

Prior to the evidentiary hearing, Ms. Benedetti and Mr. Carroll, an investigator with the D.A.'s office, visited Mr. Jackson and advised him that he could face charges of perjury if he testified falsely at the evidentiary hearing. ¶ 243, 248. Mr. Jackson wrote a note recanting his admission to T.S.'s attack. ¶ 249. Nevertheless, at the evidentiary hearing in July 2015, Mr. Jackson (represented by counsel) testified and admitted to attacking T.S. ¶253, 254. He also testified that he wrote the recantation note because he felt intimidated by Ms. Benedetti and Mr. Carroll. ¶ 259. On December 15, 2015, the state court vacated Mr. Moses-El's conviction, freeing him after 28 years of wrongful incarceration. ¶ 263. At that time, Ms. Kimbrough, a spokesperson for the D.A.'s office, made various statements to the press and others that falsely characterized various items of factual evidence, including contending that Mr. Jackson's confession was untruthful. ¶ 265.

At this point in time, the D.A.'s office was considering whether to re-try Mr. Moses-El for the attack on T.S. The D.A.'s office ultimately elected to re-try Mr. Moses-El for the attack, and that trial occurred in November 2017. ¶ 335. The Amended Complaint references at least three items of evidence that the prosecution put forward at the second trial. Dr. Brown testified as before, that the blood test results were inconclusive. ¶ 354. The prosecution also presented the testimony of Floyd Howard, a witness who had encountered T.S. shortly after she had been assaulted. ¶ 314. Mr. Carroll and Ms. Benedetti had spoken with Mr. Howard, in August 2016,

at which time Mr. Howard informed them that he had been "racking his brain" to remember the incident 28 years earlier, and that he recalled "that T.S. had called out the name of 'Bubba'" – a variation on Mr. Moses-El's nickname – "as the one who had assaulted her." ¶ 314. Mr. Moses-El's counsel cross-examined Mr. Howard on this recollection, pointing out that, many years earlier, Mr. Howard had stated no recollection of that identification and that, when talking more recently to Mr. Moses-El's investigation, Mr. Howard rated his confidence in such a recollection as a "1 out of 10," whereas now, during the second trial, he rated that confidence as a "10 out of 10." ¶ 318. The D.A. also called Stephanie Burke, Mr. Moses-El's then-wife and an acquaintance of T.S.'s, to testify. ¶ 324. The prosecution's theory was that Ms. Burke was having a disagreement with T.S. in the time period preceding the assault and that Ms. Burke directed Mr. Moses-El to attack T.S. ¶ 328. The Amended Complaint primarily takes issue with the fact that the D.A. offered immunity to Ms. Burke to testify, so as to overcome her invocation of the spousal privilege, when the D.A. did not similarly offer immunity to Mr. Jackson. ¶ 326. Mr. Moses-El was acquitted at the second trial. ¶ 357. This lawsuit followed.

## ASSERTED CLAIMS

Based on these facts, Mr. Moses-El asserts seven claims for relief, all arising pursuant to 42 U.S.C. § 1983: (i) a claim sounding in malicious prosecution under the 4th and 14th Amendments to the United States Constitution, against Defendants Morrissey, Benedetti, Kimbrough, Carroll, Brown, and the Estate, in that they lacked probable cause to charge Mr. Moses-El in both the 1988 and 2016 prosecutions; (ii) a claim that Mr. Whitley and Mr. Huff violated Mr. Moses-El's rights under the 14th Amendment – the right in question is not identified but the Court will assume it is the right to substantive due process – by failing to prevent the destruction of the DNA samples and other evidence; (iii) a claim that Ms. Benedetti and Mr.

Carroll violated Mr. Moses-El's 14th Amendment rights – again, the right in question is not specified, but the Court will assume it is the right to substantive due process – by "manfactur[ing] false inculpatory evidence" used at the second trial, specifically that they "intimidated" Mr. Jackson, via "threat[s] that they could file further charges against him," into recanting his confession, by "persuad[ing]" Mr. Howard "to remember" an identification made by T.S. that Mr. Howard was previously unsure of, and by "willfully and wantonly" giving Ms. Burke immunity "for the sole purpose of fabricating" evidence that Ms. Burke had directed Mr. Moses-El to commit the attack; (iv) a claim that Denver violated his 14th Amendment rights – presumably substantive due process – by maintaining a custom or policy of "pursuing malicious prosecutions to cover up wrongful convictions," of mishandling evidence in various respects, and of failing to train or supervise its forensic laboratory personnel; (v) a claim that Defendants Morrissey, Benedetti, Kimbrough, and Carroll conspired to deprive him of unspecified rights under the 4th and 14th Amendments, in that they "reached an agreement amongst themselves to use their positions of authority and influence to spread lies about the 1987 crime . . . and to prosecute him through any means possible"; (vi) a claim that all of the individual defendants violated his substantive and procedural due process rights under the 14th Amendment by performing various acts (*i.e.* destroying or withholding evidence, manufacturing evidence, refusing to investigate alternative suspects, and misrepresenting the results of blood tests, among others) "ensuring that Mr. Moses-El's prosecution and criminal trials lacked fundamental fairness"; and (vii) a claim that Mr. Morrissey violated his substantive and procedural due process rights under the 14th Amendment by failing to adequately supervise and train D.A.'s office staff, such as Ms. Benedetti, Ms. Kimbrough, and Mr. Carroll.

All of the Defendants have moved to dismiss Mr. Moses-El's claims, raising a wide range of arguments. In the interests of efficiency, the Court will forego a recitation of the various arguments each Defendant have made, simply address the pertinent issues in its analysis.

## ANALYSIS

The Court begins is analysis with challenges to the sufficiency in pleading of Mr. Moses-El's claims under Fed. R. Civ. P. 12(b)(6). Denver expressly raised this issue with regard to claims against it. It is also an essential consideration with regard to every claim brought against the individual Defendants, because each has invoked the defense of qualified immunity, and the first prong of the qualified immunity analysis requires an examination of the sufficiency of the constitutional claim under the standards that govern Rule 12(b)(6). *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

### A. Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations in the Amended Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To make such an assessment, the Court first

discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678-79. The Court takes the remaining, well-pleaded factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. Id. What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

### B. Malicious prosecution

The Court begins with Mr. Moses-El's first claim for relief, which sounds in malicious prosecution. To prove a claim for malicious prosecution under 42 U.S.C. § 1983, Mr. Moses-El must show that: (i) the named defendant caused his continued confinement or prosecution; (ii) the criminal action terminated in his favor; (iii) no probable cause supported the original arrest, continued confinement, or prosecution; (iv) the defendant acted with malice; and (v) Mr. Moses-El suffered injury as a result. *Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017). The first element – that each named defendant caused Mr. Moses-El's prosecution or confinement – can be satisfied by the defendant personally initiating the criminal proceedings, or by that person taking an active part in continuing or procuring the continuation of proceedings, such as by concealing or misrepresenting material facts to prosecutors or the courts. *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-92 (10th Cir. 2004).

1. <u>Failure to allege a sufficient act</u>

The Court can summarily dispense with the malicious prosecution claim against Ms. Kimbrough. The only allegations in the Amended Complaint regarding her are that she made various (false) statements to media outlets regarding Mr. Moses-El's release. Although Mr. Moses-El may rightfully be offended that the D.A.'s office's spokesperson made false <u>public</u> statements about his case, the Amended Complaint does not allege that Ms. Kimbrough made any such statements in the capacity <u>as a witness</u>, such that she could be said to have participated in the decision to initiate or continue Mr. Moses-El's prosecution or confinement. Indeed, such claims against Ms. Kimborough appear wholly frivolous. The Court therefore dismisses Mr. Moses-El's malicious prosecution claim against her for failure to state a claim.

The Court also summarily dismisses this claim as asserted against Mr. Morrissey. Putting aside Mr. Morrissey's supervisory authority, which Mr. Moses-El (and the Court) addresses in a different claim, the only allegations in the Amended Complaint involving actions taken personally by Mr. Morrissey are that Mr. Morrissey lobbied the Colorado legislature to not enact legislation that would have granted some measure of relief to individuals like Mr. Moses-El who were harmed by the destruction of evidence. A labored argument could be made that, by publicly opposing legislation that might have led to Mr. Moses-El's release, Mr. Morrissey may have played some indefinable role in "continuing" Mr. Moses-El's confinement. But the Court is confident that legislative advocacy regarding potential criminal justice laws is not the type of activity that can be considered "malicious prosecution." By that measure, any other person who testified (or indeed, even signed a petition or lobbied their representative) regarding the bills in question could also be alleged to have maliciously prosecuted Mr. Moses-El. Accordingly, the Court dismisses the malicious prosecution claim against Mr. Morrissey as well.

Next, the Court turns to the allegations against Mr. Carroll and Ms. Benedetti. The Amended Complaint describes two pertinent actions by these defendants: (i) they intimidated Mr. Jackson into briefly recanting his confession, and (ii) they somehow caused Mr. Howard to fabricate his recollection that T.S. had identified Mr. Moses-El on the night of the attack.[2] As to Mr. Jackson's recantation, it is sufficient to observe that nothing in the Amended Complaint suggests that Mr. Jackson's brief recantation caused Mr. Moses-El's continued prosecution or confinement; indeed, it is clear that, by the time of the evidentiary hearing regarding Mr. Jackson's confession, Mr. Jackson had recanted that recantation and he repeated his confession that he had assaulted and raped T.S. ¶ 254-259. As to Mr. Howard, the Amended Complaint asserts the conclusions that Mr. Carroll and Ms. Benedetti "fabricated" the statement that Mr. Howard gave, ¶ 371, or that they "persuaded" Mr. Howard to fabricate his recollection. ¶ 412. But actual factual averments in the Amended Complaint do not support that conclusion. They allege only that <u>Mr. Howard</u> reported that recollection to Mr. Carroll and Ms. Benedetti. ¶ 312. Although Mr. Moses-El might doubt whether Mr. Howard reached that recollection independently and may believe that Mr. Carroll and Ms. Benedetti may have instructed, persuaded, or suggested to Mr. Howard that he recall the event a certain way, Mr. Moses-El has not articulated any facts that would support such a proposition. Thus, the malicious prosecution claim is dismissed as against Mr. Carroll and Ms. Benedetti.

---

[2]     The Court finds that the remaining allegations against Ms. Benedetti, such as suggesting the appointment of counsel for Mr. Jackson, offering Mr. Moses-El an *Alford* plea, or granting immunity to Ms. Burke, do not describe any conduct that could be cognizable as malicious prosecution.

2. <u>Failure to allege state of mind</u>

That leaves the malicious prosecution claims against the Estate (based on Mr. Huff's destruction of the blood and semen sample evidence in 1995) and Dr. Brown. The Court will assume, without necessarily finding, that the acts of Mr. Huff and Dr. Brown had the effect of prolonging Mr. Moses-El's incarceration. However, the Court finds that the malicious prosecution claim must be dismissed against both defendants due to the Amended Complaint's failure to adequately allege facts, which if true, would establish the requisite *mens rea* – malice – of these actors. In *Iqbal*, the Supreme Court rejected the argument that allegations that an actor "knew of, condoned, and willfully and maliciously agreed" to take an action was sufficient to plead the required *mens rea* element; the Court found that "[t]hese bare assertions. . . amount to nothing more than a formulaic recitation of the elements" and should be discarded as conclusory. 556 U.S. at 680-81. Although the respondent's complaint alleged the petitioner's' "malicious" intent, the Court determined that the "complaint does not contain any factual allegation sufficient to plausibly suggest petitioner's discriminatory state of mind." *Id.* at 683. Thus, merely characterizing a defendant's state of mind as "malicious" or "intentional" or with some other conclusory label is not sufficient; Mr. Moses-El must identify particular facts that would permit the conclusion that the defendant possessed the requisite *mens rea*.

Moreover, as noted above, a plaintiff must plead facts that show "more than the mere possibility of misconduct." *Id.* at 679. It is not enough to plead facts that are "merely consistent with a defendant's liability" – that is, facts that would permit many possible inferences, only one of which is the inference urged by the plaintiff. *Id.* at 678. This is because pleadings which are "so general that they encompass a wide swatch of conduct, much of it innocent," will not suffice. *Khalik*, 671 F.3d 1188 at 1191. Thus, where Mr. Moses-El must plead a defendant's malicious

12

intent, coming forward with a set of facts that permit the inference that the defendant instead acted merely negligently will not suffice; rather, Mr. Moses-El must plead facts that, taken in the light most favorable to him, dispel the possibility that the defendant acted with mere negligence. As noted in *Iqbal*, Fed. R. Civ. P. 9(b)'s allowance that facts concerning a defendant's *mens rea* may be "alleged generally" does not alter this analysis. The Supreme Court explained that "Rule 9 . . . does not give [a plaintiff] license to evade the less rigid – though still operative – strictures of Rule 8." 556 U.S. at 686-87.

With these standards in mind, the Court turns to Mr. Moses-El's malicious prosecution claim against the Estate. Mr. Huff is alleged to have participated in Mr. Moses-El's prosecution in two respects: (i) he investigated T.S.'s assault in the first instance, and (ii) he allowed the crime scene samples to be destroyed in 1995. As to Mr. Huff's participation in the investigation into the attack on T.S., the Amended Complaint directly accuses Mr. Huff of only one act: harboring "doubts about the validity of T.S.'s identification of Mr. Moses-El." ¶ 64. But the Amended Complaint makes clear that Mr. Huff "conveyed his concerns to the Denver D.A.'s office" about that matter. Thus, this action cannot give rise to a claim for malicious prosecution against the Estate. The Amended Complaint also makes a generalized assertion that "the Denver Police Department, including Defendant Huff, . . .stopped investigating the identity of the perpetrator of the crimes against T.S." at some point in time. ¶ 66. But Mr. Huff's failure to properly investigate other suspects is the subject of another claim as well (Claim 6). Thus, the Court finds that Mr. Moses-El's claim for malicious prosecution against the Estate, to the extent it relates to Mr. Huff's investigation, must be dismissed for failure to state a claim.

As to Mr. Huff's approval of the destruction of the evidence in 1995, even if such conduct can be said to have continued Mr. Moses-El's confinement (and the Amended

Complaint is necessarily speculative on this point, as it is impossible to say what testing of those samples would have revealed), the Amended Complaint fails to assert that Mr. Huff acted intentionally and maliciously, rather than simply negligently. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007). The Amended Complaint seems to acknowledge that Mr. Huff subjectively believed the evidence could be discarded because the associated case was so old, ¶ 159, that he "did not look at" the notes that indicated the samples should be saved, ¶ 160, and that he expected that someone would have contacted him personally if they wished that evidence be preserved and that no one had, ¶ 162. These allegations certainly point to carelessness by Mr. Huff, but they are not enough to show affirmative mendacity or malice. Nowhere does the Amended Complaint assert facts that show that Mr. Huff was subjectively aware of the need to retain the evidence and that he directed that it be destroyed with the specific purpose of depriving Mr. Moses-El of it or with substantial certainty that this would be the result. Accordingly, the malicious prosecution claim against the Estate is dismissed.

Finally, the Court considers the malicious prosecution claim as against Dr. Brown. The allegations, which the Court takes as true, are that Dr. Brown knew that the blood test results effectively ruled out Mr. Moses-El as a suspect, but that Dr. Brown falsely claimed that the test results were inconclusive. To determine whether Dr. Brown's testimony caused or continued Mr. Moses-El's prosecution, the Court considers whether probable cause to prosecute Mr. Moses-El would have existed had the information Dr. Brown allegedly withheld – that is, that the blood tests excluded Mr. Moses-El as a source of the evidence – were included in the record. *McCarty v. Gilchrist*, 646 F.3d 1281, 1286 (10th Cir. 2011). Taking the allegations in the light most favorable to Mr. Moses-El, the Amended Complaint indicates that Dr. Brown knew "that Mr. Moses-El was not the donor of the semen," and thus, did not rape T.S. There is reason to

believe that this fact, if disclosed, might have vitiated any other probable cause that might have existed to charge Mr. Moses-El.

However, once again, the Amended Complaint lacks allegations of facts that show that Dr. Brown acted with malice. The sole allegation in the Amended Complaint that purports to demonstrate that malice is Paragraph 118, which reads "[g]iven [Dr. Brown's] qualifications and experience, as well as her previous testimony where she recognized the significant inferences that could be deduced by results such as those described above, her gross mischaracterization of the serological evidence in this case as inconclusive . . . was malicious." But the conclusion – maliciousness – does not necessarily flow from the facts: that Dr. Brown was experienced and qualified and that she recognized that inferences about the perpetrator could be drawn from the blood test results. Although malice is one inference that might be drawn from these facts, other equally (if not more likely) permissible inferences are that Dr. Brown was mistaken in her testing or analysis or that she conservatively chose not to ignore the (admittedly) small possibility that the test did <u>not</u> exclude Mr. Moses-El. Once again, *Iqbal* requires Mr. Moses-El to plead facts that establish a <u>probability</u>, not a <u>possibility</u>, that Dr. Brown acted with malice against him, and describing a set of facts that could readily be consistent with mere negligence does not suffice. Accordingly, the malicious prosecution claim against Dr. Brown is dismissed.

Thus, the malicious prosecution claim is dismissed in its entirety.

**C. Destruction of evidence**

Mr. Moses-El asserts an unspecified 14th Amendment claim against Mr. Whitley and the Estate relating to the 1995 destruction of the blood and semen samples taken from T.S. When allegedly exculpatory evidence is destroyed, a defendant who is subsequently exonerated via collateral proceedings may bring § 1983 claims contending that the destruction of that evidence

denied him a fair trial. *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999). The contours of such a claim are somewhat unclear, but it is evident that, at a minimum, the plaintiff must allege facts showing that the actors in question – Mr. Whitley and Mr. Huff – had the requisite degree of culpability, which courts have generally held to require either intentional or reckless acts. *See e.g. Newton v. City of New York*, 779 F.3d 140, 155-56 (2d Cir. 2015); *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002) (requiring a showing of "bad faith" by the defendant; even "gross negligence" is not sufficient).

The Amended Complaint does not sufficiently allege that either Mr. Whitley or Mr. Huff acted intentionally or recklessly with regard to the blood and semen sample evidence in 1995. Indeed, the Amended Complaint does not allege any affirmative act by Mr. Whitley that led to the destruction of the evidence; to the contrary, the Amended Complaint clearly contends that Mr. Whitley specifically requested to Denver police that the evidence be preserved. ¶ 151. The most Mr. Moses-El can say of Mr. Whitley is that he "conducted no follow-up" on his request. ¶ 156. At best, such an allegation is that Mr. Whitley acted negligently, rather than recklessly, intentionally, or in bad faith. Accordingly, Mr. Moses-El fails to state a claim against Mr. Whitley relating to the destruction of the samples.

For the same reasons, Mr. Moses-El's claim against the Estate fails. As discussed above, the allegations in the Amended Complaint are susceptible to an interpretation that Mr. Huff was, at best, negligent in approving the request to destroy the blood and semen samples in Mr. Moses-El's case. Mr. Moses-El has not articulated any facts that would indicate that Mr. Huff purposefully destroyed the evidence to frustrate Mr. Moses-El's case or that Mr. Huff was deliberately indifferent to – that is, conscious of -- the possibility that the destruction of evidence would harm Mr. Moses-El. Rather, the facts alleged by Mr. Moses-El reflect simply that Mr.

Huff was careless in approving the destruction of the evidence. In the absence of sufficient allegations of Mr. Huff's *mens rea*, Claim 2 must be dismissed in its entirety.

### D. Fabrication of evidence

Mr. Moses-El alleges that Ms. Benedetti and Mr. Carroll violated his 14th Amendment rights by "fabricating evidence." The Amended Complaint appears to indicate that this claim is based upon three acts taken by these defendants: (i) threatening Mr. Jackson until he recanted his confession; (ii) inducing Mr. Howard to falsely recall T.S. identifying Mr. Moses-El on the night of the attack; and (iii) granting immunity to Ms. Burke in order to force her to testify against Mr. Moses-El.

The Court has already addressed the first two issues in the analysis above. It is not evident from the Amended Complaint that these Defendants engaged in any misconduct with regard to Mr. Jackson; the only allegation about such "threats" is that they informed him that he could be charged with perjury if he testified falsely in favor of Mr. Moses-El, a warning that is incontrovertibly accurate. ¶ 248. But even if such an allegation were sufficient to demonstrate a threat, it is clear that its effect on Mr. Jackson was only temporary, and that despite briefly recanting his confession, he nevertheless took the stand at Mr. Moses-El's evidentiary hearing and repeated his confession. And, as discussed above, the allegations in the Amended Complaint do not permit the inference that Ms. Benedetti or Mr. Carroll specifically induced Mr. Howard's recollection of T.S.'s identification.[3]

---

[3] The Amended Complaint makes clear that Mr. Moses-El took the opportunity to thoroughly cross-examine Mr. Howard about his sudden recollection of T.S.'s identification of Mr. Moses-El during the second trial. ¶ 318. To the extent that cross-examination revealed some reason to believe that Mr. Howard specifically attributed his sudden recall to acts of Ms. Benedetti or Mr. Carroll, the Amended Complaint certainly does not recite that testimony.

That leaves only the allegations regarding Ms. Burke. The Court is simply unable to comprehend how Ms. Benedetti's decision to offer Ms. Burke immunity for testimony she might give regarding Mr. Moses-El supports an assertion that Ms. Benedetti "fabricated" any evidence. The Amended Complaint does not assert that Ms. Burke testified falsely at Mr. Moses-El's second trial. Without an allegation that Ms. Burke presented any "fabricated" evidence, Mr. Moses-El's theory that it was Ms. Benedetti or Mr. Carroll who caused the fabrication of such evidence fails to state a claim. Accordingly, Claim 3 is dismissed in its entirety.

**E. Conspiracy**

The Court skips over certain interstitial claims for the moment, proceeding to Mr. Moses-El's Claim 5, which alleges that Defendants Morrissey, Benedetti, Kimbrough, and Carroll conspired to "use their positions of authority and influence to spread lies about the 1987 crime . . . and to prosecute [Mr. Moses-El] through any means possible."

The Amended Complaint contains no allegations identifying any express agreement among any of these Defendants, nor does it plead any facts that would allow the Court to infer such an agreement. Mere conclusory assertions about the existence of a conspiratorial agreement are insufficient to state a claim. *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010). Indeed, it is entirely unclear how the disparate allegations against each member of the alleged conspiracy – Mr. Morrissey accused of testifying in opposition to a legislative proposal; Ms. Kimbrough making statements to the press, and Ms. Benedetti and Mr. Carroll contacting witnesses in preparation for the second trial – have anything to do with one another. Moreover, as the preceding discussion makes clear, Mr. Moses-El has not identified any constitutional deprivations committed by any of the identified Defendants that would support his conspiracy claim in any event. Therefore, this claim is dismissed.

### F. "Fair trial" claim

Mr. Moses-El's Claim 6 alleges that the various individual Defendants deprived him of his 14th Amendment right to a fair trial. The allegations in this claim appear to duplicate the allegations addressed above.[4] For the same reasons previously stated, these allegations fail to state a constitutional claim and thus, Claim 6 is dismissed.

### G. Mr. Morrissey's supervisory liability

Claim 7 asserts that Mr. Morrissey failed to adequately supervise the members of the D.A.'s office – most notably, Ms. Kimbrough, Ms. Benedetti, and Mr. Carroll – and that Mr. Morrisey is therefore liable for any deprivations of Mr. Moses-El's constitutional rights by members of the D.A.'s office.

Extensive discussion of this claim is not required. Mr. Morrissey can only be liable to Mr. Moses-El for failure to supervise the D.A.'s office if there is evidence that a member of the D.A.'s office violated Mr. Moses-El's constitutional rights. *See Bryson v. Gonzales*, 534 F.3d 1282 (10th Cir. 2008) (plaintiff must demonstrate an "affirmative link" between the supervisor's conduct and a constitutional violation). As the preceding discussion demonstrates, the Amended Complaint fails to adequately allege any constitutional deprivation committed by anyone under Mr. Morrissey's watch. Thus, Claim 7 is dismissed.

---

[4] Arguably, this claim introduces a new assertion that Mr. Huff violated Mr. Moses-El's 14th Amendment rights by failing to adequately investigate the attack on T.S., and thus, failed to discern the fact that Mr. Jackson was the true perpetrator. Assuming that "failure to investigate" is a colorable constitutional claim, Mr. Moses-El must nevertheless allege that Mr. Huff acted with deliberate or reckless intent. *Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995), *but see Parker v. City of Tulsa*, 745 Fed.Appx. 79, 81 n. 1 (10th Cir. 2018) (expressing doubt that an exonerated defendant can state a claim for "reckless failure to investigate evidence indicating his possible innocence," and suggesting that such claims must fit within the malicious prosecution rubric). For the same reasons discussed above, the Amended Complaint does not plead any facts that would permit the inference that Mr. Huff's inadequate investigation was purposeful, as opposed to merely negligent.

**H. Denver's liability**

The final remaining claim is one that alleges that Denver maintained various municipal customs or policies that resulted in Mr. Moses-El's constitutional rights being violated.

Municipal entities can be held liable for constitutional violations that are committed by their employees if a plaintiff can demonstrate that such deprivations were caused by a municipal custom or policy and that the custom or policy was adopted or maintained by the municipality with a sufficiently culpable state of mind (*i.e.* with reckless disregard of the potential that it might cause a constitutional deprivation). *See Harte v. Board of Commissioners*, 864 F.3d 1154, 1195 (10th Cir. 2017). For the same reasons set forth above, Mr. Moses-El's claim against Denver fails because the Amended Complaint has not adequately pled the existence of any actual constitutional deprivation. The preceding discussion concludes that the claims that the named Defendants engaged in such constitutional violations must be dismissed. In addition to those allegations, the Amended Complaint speaks generally of actions taken by unidentified persons at the D.A.'s office and the Denver Police Department. But these vague and generalized references fail to sufficiently allege a constitutional violation for many of the same reasons already recited – there are no meaningful allegations that the unnamed actors performed those actions with the requisite state of mind to render their actions unconstitutional.

Even if Mr. Moses-El could establish that he suffered a constitutional deprivation due to a custom or policy of Denver's, his claim would nevertheless fail for a second reason: the Amended Complaint has not adequately alleged Denver's culpable state of mind. For this claim, it must allege facts that show that, at the time Mr. Moses-El suffered a constitutional deprivation, Denver was on notice that its policies were inadequate to prevent constitutional violations and that Denver was deliberately indifferent to that fact. *Board of County Commissioners v. Brown*,

520 U.S. 397, 407-08 (1997). Typically, to establish a municipality's state of mind, a plaintiff will demonstrate a "pattern of constitutional violations" that preceded the violation suffered by the plaintiff himself, thereby demonstrating the municipality's awareness of both the risk of constitutional deprivation and the inadequacy of the municipality's existing policies to address it. *Id.* Mr. Moses-El recites, in broad and general terms, three occasions between 1974 and 1984 in which evidence in the custody of the Denver Police Department was destroyed prematurely, but he has not recited facts that suggest that the three incidents resulted from a common municipal custom or policy, much less that it was the same municipal policy, still in effect, that caused the destruction of <u>his</u> evidence.[5] ¶ 264-366. Indeed, in at least one instance cited by Mr. Moses-El, the evidence in question was never even logged by the Denver Police Department – it was instead a note, jotted down by a detective while taking a phone call at his home, then accidentally lost by the detective before the case proceeded to trial.[6] *People v. Gann*, 724 P.2d 1318, 1319 (Colo. 1986). Thus, it is not clear how this situation bears on Denver policies involving the purposeful (but mistaken) destruction of evidence after a conviction had been obtained.

Accordingly, the Court finds that Mr. Moses-El has not adequately alleged facts that would allow a *Monell*-style claim against Denver to proceed. Claim 7 is dismissed.

## CONCLUSION

---

[5] A fourth instance, in which evidence was destroyed in 2002, ¶ 367, is insufficient to satisfy Mr. Moses-El's pleading requirements because his evidence was destroyed in 1995. Thus, the 2002 incident could not have put Denver on notice as of 1995 that its evidence-handling procedures were constitutionally deficient.

[6] The Colorado Supreme Court also concluded that the note was not exculpatory evidence, and thus, the loss of that evidence did not deprive the defendant of any constitutional rights anyway. 724 P.2d at 1322.

To be clear: what happened to Mr. Moses-El was horrifyingly unjust and represents troubling failures at multiple levels of the law enforcement and criminal justice systems. Mr. Moses-El and his supporters have every right to be upset and angry at the many ways in which city and state institutions failed to protect him. But not all systemic failures give rise to constitutional claims. As discussed above, the constitution protects against purposeful or reckless actions by government actors, but it offers relatively little solace for those who are injured as a result of negligence or incompetence of police or prosecutors. Whether Mr. Moses-El has other remedies available to him for the actions described in the Amended Complaint is beyond the scope of the analysis here. It is sufficient to note that the facts alleged in the Amended Complaint do not adequately allege violations of the U.S. Constitution, and thus must be dismissed. [7]

---

[7] Ordinarily, when claims are subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the Court considers whether the plaintiff should have an opportunity to amend the complaint to cure pleading defects.

Here, the Court finds several reasons why leave to amend should not be granted. First, the Court notes that Mr. Moses-El is represented by counsel, who has already amended the Complaint once, in response to motions to dismiss. (# 28, 33) Those motions raised many of the issues addressed by the Court here, and thus, the Court must conclude that, despite best efforts, there are simply no factual allegations that will meet the legal standard. *See Bekkem v. Wilkie*, 915 F.3d 1258, 1275-76 (10th Cir. 2019) (court may deny leave to amend where prior efforts to cure defects were unsuccessful).

Second, unlike many litigants who must plead without the benefit of any discovery, Mr. Moses-El has had several opportunities, through his trials and evidentiary hearings, to take testimony on the issues herein from several of the defendants, including Mr. Huff, Dr. Brown and Mr. Howard. With this head-start, and in the absence of any representation by Mr. Moses-El that there are additional facts which he could plead, the Court is not sanguine that a grant of leave to further amend will be fruitful.

Finally, the Court notes that both Mr. Moses-El's initial Complaint (at 98 pages and 406 numbered paragraphs) and Amended Complaint are documents that strain the limitations imposed by Fed. R. Civ. P. 8 and the Court has little interest in inviting a document that only threatens to expand further.

Accordingly, the Court will not reflexively grant leave to amend to Mr. Moses-El. If Mr. Moses-El believes that he can remedy the pleading defects addressed herein, he is free to file a

For the foregoing reasons, the Defendants' Motions to Dismiss (**# 57, 62, 86**) are **GRANTED**.

All claims in the Amended Complaint are **DISMISSED** for failure to state a claim. The Clerk of the Court shall close this case.

      Dated this 25th day of March, 2019.

                                     **BY THE COURT:**

                                     Marcia S. Krieger
                                     Senior United States District Judge

---

motion to amend (and to reopen this case), attaching a proposed Second Amended Complaint, and the Court will evaluate at that time whether leave should be granted.